JUDE G. GRAVOIS, Judge.
^Defendants have appealed a trial court judgment awarding damages to plaintiffs in this dispute involving defendants’ use of plaintiffs’ riparian rights. For the reasons that follow, we affirm.

PROCEDURAL HISTORY AND FACTS

Plaintiff, Phillip Family, L.L.C., owns a parcel of land on the right descending bank of the Mississippi River in St. Charles Parish (“the Phillip Family property”) adjacent to and downriver from a parcel of land owned by defendant, Bayou Fleet Partnership (“the Bayou Fleet property”). These parcels of land front on the Mississippi River and are situated between Louisiana Highway 18 (commonly known as the “River Road”) and the mean low water mark of the river. This property is commonly known as “batture” property. Plaintiff, Beverly Construction Company, operates a business on the Phillip Family property, and defendant, Bayou Fleet, Inc., operates a business on the Bayou Fleet property. On | ¡¡March 6, 2006, plaintiffs filed a petition for damages and for injunctive relief against Bayou Fleet Partnership. Bayou Fleet, Inc. was added as a defendant in a supplemental and amending petition. Plaintiffs alleged that defendants’ unauthorized practice of mooring barges in front of the Phillip Family property prevented plaintiffs from utilizing their property to its fullest potential and interfered with plaintiffs’ business activities. Plaintiffs sought a permanent injunction preventing defendants from mooring barges in front of the Phillips Family property and from interfering with plaintiffs’ use and enjoyment of their property. Plaintiffs also sought damages in the form of rental payments and attorney’s fees.
Defendants removed the suit to federal court. The federal court, however, re *1161 manded the case to state court, finding that there was a valid state law claim and no exclusive issue under federal law. Defendants then answered plaintiffs’ suit and filed a reconventional demand against plaintiffs.
The matter was bifurcated for trial. On October 19, 2010, a bench trial was held on the injunctions. By judgment signed on January 26, 2011, the trial court granted plaintiffs’ petition for permanent injunction against defendants, enjoining and restraining defendants from mooring and fleeting any kind of vessel in front of the Phillip Family property. This judgment also granted defendants’ request for injunctive relief prohibiting plaintiffs from conducting dredging operations in front of the Bayou Fleet property to the extent that such dredging operations would interfere, impede, impair or otherwise block the fleeting and mooring activities conducted by or on behalf of defendants.[1]
Following a two-day bench trial on the issues of causation and damages, judgment was rendered on December 14, 2011 in favor of plaintiffs awarding |4$78,680 in damages for lost rentals, plus legal interest and costs, and dismissing defendants’ reconventional demand. Defendants’ motion for new trial was denied. This timely appeal followed.
In their only assignment of error, defendants argue that the trial court was manifestly erroneous and/or clearly wrong is awarding $78,680 in special damages to plaintiffs, asserting that the damage award is “wholly unsupported by the evidence and clearly contrary to the testimony provided at trial.” Defendants argue that because plaintiffs continuously used their property for commercial gain, they did not lose any lease revenues because of defendants’ fleeting operations in front of their property. Plaintiffs respond that the trial court’s damage award is substantiated by the evidence and supported by the law.
At trial, Johnny Riley testified that he had been employed by Beverly Construction for ten years. He worked at the subject property continuously from about 2000 until about 2007. Mr. Riley testified that barges were moored by defendants in the river in front of the Phillip Family property “just about every day.” There usually were three or four and sometimes five barges. On some occasions in order to unload limestone, defendants had to be contacted to move the barges out of the way. Pictures taken by Mr. Riley over the years were admitted into evidence. Photographs dated March 3, 2005 show barges fleeting in front of the Phillip Family property. Photographs dated March 11 and 12, 2005 show a cable tied to a buoy and barges fleeting in front of the property. Photographs dated September 17, 2007 shows barges fleeting in front of the property. Photographs dated September 28, 2007 show a buoy with a cable “blocking” the Phillip Family property. Other pictures dated March 17, 2005, April 20, 2005, and October 1 and 15, 2007 also show barges fleeting in front of the property. Mr. Riley testified that | Sthese pictures were just a sample of “what [he] saw everyday” during the time he worked on the Phillip Family property for about seven years.
On cross-examination, Mr. Riley admitted that on some days, no barges were moored in front of the property. He was not able to tell how long it was between *1162 the time he took the pictures and the time the barges depicted in the pictures were moved. He admitted that defendants moved the barges when requested.
Luiz Martinez, the Geographic Information Systems (“GIS”) manager for St. Charles Parish, testified as to aerial photographs of the property. Photographs dated June 16, 2005, August 31, 2005, October 27, 2005, February 6, 2006, April 30, 2006, July 23, 2007, February 5, 2009 and May 18, 2009 depict “some structures” floating in the river in front of the Phillip Family property. On cross-examination, Mr. Martinez admitted that in two of the photographs, there were tug boats near the barges, but he did not know if the tugs were moving the barges. He was unable to tell if the vessels were in the same place the day before or the day after the photographs were taken.
Mary Clulee testified that she owns property immediately adjacent to and downriver from the Phillip Family property. She went on her property at frequencies varying from several times per day to one time per month over the past twelve to fifteen years. In the past ten years, more often than not, she saw barges tied to buoys floating in the river in front of the Phillip Family property. Sometimes a tug boat would be on the downriver side of the barges and other times there was no tug. Sometimes the barges remained docked for more than one day. Photographs taken by Mrs. Clulee dated April 3, 2006, April 9, 2006, and September 17, 2009, depicting barges moored in front of the Phillip Family ]f,property, were admitted into evidence. Although she had no pictures to prove it, she stated that the barges sometimes stayed in place for four days.
Cary Burelle, general manager of Beverly Construction, testified that he “sometimes” went to the Phillip Family property, and most of the time when he was there, barges were paralleling the shore of the property. He recalled two occasions when barges moored in front of the property prevented plaintiffs from unloading rock barges. Defendants did move the barges out of the way, but it took a “couple of hours.” Beginning in 2006, one of defendant’s buoys moved downriver in front of the Phillip Family property.
A.J. Phillip testified that his family owns the Phillip Family batture property and it is leased to Beverly Construction. The property has 465 feet of frontage along the Mississippi River. A sand pit operation and a limestone operation are conducted on the property. Since he purchased the property in 2000, defendants’ barges have blocked access to the property from the river from eighty-five to ninety per cent of the time. This continued until October 2010 when he obtained the injunction against defendants. He spoke to a couple of people about leasing the riparian rights to the property, specifically, Steven Treut-ing or someone from Pontchartrain Materials Corporation (“PMC”), but they did not want to get involved because they did business with defendants. He also spoke to Billy Weidner at Magnolia Fleets about leasing the property.
On cross-examination, Mr. Phillips admitted that he had a verbal agreement with defendants to allow barges to “partially hang” in front of his property. He interpreted this agreement to allow just the nose or tail of the barge extending on to his property or about 20 to 50 feet hanging over, not the whole barge. In 2005, Mr. Phillips applied for a permit to dredge the river. He then told defendants to stop encroaching on his property, but defendants continued to do so. He con *1163 tacted an 17attorney who wrote a letter to defendants demanding they stop mooring barges in front of his property. Dredging was initially conducted in front of the property and in front of defendants’ property by Weeks Marine and by T.L. James. In 2008, Beverly purchased its own dredge and has been dredging in front of both properties.
Mr. Phillips testified that he spoke to Mr. Weidner at Magnolia Fleets about leasing the property. Mr. Weidner “did not want to be involved” in the dispute, but he never said they were not interested in leasing his property. He also recalled talking to someone at PMC, but was not sure if it was Steve Treuting. Mr. Phillips eould not recall what year these conversations took place. It was his understanding that these potential tenants did not want to lease the property because of defendants’ fleeting operation. Mr. Phillips acknowledged that he never advertised the property for lease. He stated that if he did lease the riparian rights, he would continue to operate the sand pit, and to conduct limestone unloading and dredging.
Henry Tatje, III, who was accepted as an expert commercial real estate appraiser, testified that he was asked to appraise the market value for rent of the riparian rights in front of. the Phillip Family property. He examined various properties from Plaquemines Parish to St. James Parish and found that the annual rental rates ranged from approximately $27 per linear foot along the river to $89 per linear foot. He concluded that the annual market value for rent of the riparian rights appertaining to the Phillip Family property is $55 per linear foot, which amounts to $25,575 per year. Mr. Tatje opined that the highest and best use of this property is for barge fleeting and river taxi service, barge repairs, and barge loading and unloading. On cross-examination, Mr. Tatje admitted that he did not look at the economical effect of fleets leasing less than 500 feet of land or the cost to place improvements on the property for a fleeting operation.
| ^Robert Brennan testified that he is a tugboat captain and began working for defendants in 2009. At the time he started working for defendants, the “tier 6” buoy, the most downriver buoy used by defendants, was located in front of the Phillip Family property; however, the tier 6 buoy was no longer being used by defendants. The “tier 5” buoy was located about 120 feet upriver from the Phillip Family property. Captain Brennan testified that when they are “building a tow” or “staging barges” for a tow, they hung the barges off of the tier 5 buoy and these barges did extend on to the area in front of the Phillip Family property. This practice stopped in early 2010.
Neal Clulee, husband of Mary Clulee, testified that he goes to his property, which has 130 feet of frontage on the river and is adjacent to and downriver from the Phillip Family property, about ten to fifteen days per month. For the last ten years, Mr. Clulee had seen barges mooring and fleeting in front of the Phillip Family property many, many times, approximately 15 to 20 days per month. Sometimes the barges were being moved, other times the barges and tug boats remained in place. Mr. Clulee owns another riverfront parcel of land which he leases to two different entities — one entity runs a sand pit and performs dredging and the other entity repairs barges. He stated that access to the river frontage of this land is the key to making money because without access from the river, “nothing happens.”
*1164 After plaintiffs concluded the presentation of their case, defendants moved for dismissal of the case, which was denied by the trial court.
William Daniel Weidner, IV, testified that he is the president of Magnolia Fleets. His father, Bill, is a partner in the company. Although he had a discussion with Mr. Phillip about leasing the area in front of his property, this conversation 19was not specifically about Magnolia Fleets leasing the property. At no time did his company have an interest in leasing the Phillip Family property.
Stephen Treuting, vice president of PMC, testified that his company transports and sells limestone and recycled concrete and asphalt. He has done business with Mr. Phillip in the past and is familiar with the subject property. He denied discussing leasing the property with Mr. Phillip. Although Mr. Treuting testified in his deposition that he did not recall discussing leasing the Phillip Family property with Mr. Phillip, at trial he testified that had there been such a conversation, he would have recalled it.
Bennet Oubre, an expert appraiser, testified that he was hired by defendants to do an appraisal of the market rent for the Phillip Family property. His appraisal was limited to the lease value of the riparian rights of the property, which he defined as the use of the water for marine activities. Mr. Oubre testified that the highest and best use of this property is the use of riparian rights for fleeting and mooring. Mr. Oubre opined that the site was not suitable for bulk storage or material transfer or water-taxi service. Due to the size of the property, the highest and best use would be to lease it in conjunction with adjoining property. Although it would be possible to fleet on the property, it may not be financially feasible. Mr. Oubre concluded that the market rental value of the mooring/fleeting rights of the Phillip Family property is $10,695 per year (equivalent to $23 per linear foot per year).
On cross-examination, Mr. Oubre admitted that the highest and best use of this site is to continue the mining operation (sand pit and dredging) and begin temporary fleeting. Mr. Oubre admitted that dredging and fleeting can co-exist because dredging has very little impact on fleeting. Mr. Oubre acknowledged that his value did not include access to the land from the River Road; he agreed that |10had he included access to the site from the River Road, the appraisal value would be higher.
Robin Durant testified that he is the president and managing partner of Bayou Fleet, Inc. and Bayou Fleet Partnership. Bayou Fleet Partnership owns the property upriver from the Phillip Family property and Bayou Fleet, Inc. owns the boats and equipment. Their core business is barge fleeting and towing. In early 2003, Mr. Phillips approached him and requested permission to dredge in front of Bayou Fleet’s property in exchange for Bayou Fleet being allowed to “hang down” in front of his property. This was a verbal agreement and, according to Mr. Durant, there were no qualifications as to how far barges would be allowed to hang over. Mr. Durant stated that the tier 6 buoy was located at the downriver end of his property and when they were using this tier, it resulted in barges hanging over the Phillip Family property. Mr. Durant admitted that this occurred frequently, virtually every time they made or broke a tow. The amount of time the barges would be in front of the Phillip Family property varied from a half an hour to two hours to several hours. He stated that within two hours, *1165 the barges would be moved. Bayou Fleet never earned additional revenue because barges were fleeted in front of the Phillip Family property; rather, they were often fleeted there out of convenience. He testified that as long as plaintiffs were dredging in front of his property, the agreement was in place for his barges to hang over the Phillip Family property. He asserted that this agreement did not end until plaintiffs obtained the injunction against defendants in October 2010. Mr. Durant explained that it was necessary for plaintiffs to obtain a permit to dredge in front of his property. He acknowledged that there were times that the barges were in the way of plaintiffs’ operations, but they moved the barges out of the way whenever this situation arose.
|n Mr. Durant testified that in 2006 and 2007 after plaintiff dredged in front of his property, the tier 6 buoy started to move downriver, eventually ending up in front of the Phillip Family property. In their re-conventional demand, defendants sought damages for the cost of relocating the tier 6 buoy back in front of their property. Mr. Durant stated that plaintiffs removed over two million cubic yards of sand from the dredging operation; however, he did not have any documents to verify this. He testified that the tier 6 buoy moved as a result of plaintiffs’ dredging operations, but he had no proof that the dredging caused the tier to move. He did not think this was something that could be proved, but it was possible to assume that the dredging caused the tier to move.
Christopher Bennett, who was employed by defendants for nine years, testified that they stopped using the tier 6 buoy because the “anchor kept dragging.” He explained that this tier was connected to a 25,000 pound anchor and the dredging unearthed the anchor.
Alan Savoie, vice president of Marine Center, a marine brokering company, testified that he has been leasing riverfront property for thirty years. Because a piece of property fronting 460 feet on the river is not big enough to start a fleeting operation, he would not have any interest in leasing the Phillips property. Only eight barges could be fleeted on a property this size, which makes it not economically feasible. Smaller pieces of property typically have less value. On cross-examination, Mr. Savoie was shown a lease of a 545-foot piece of property fronting on the river which provided for annual lease payments of $41.65 per linear foot. Mr. Savoie stated that he negotiated the price for this lease and the price was based on the location of that property, explaining that there are other similar properties that leased for only $19 annually per linear foot.

¡^ANALYSIS

The banks of navigable rivers or streams are private things which belong to the riparian, or adjacent, landowners. Ballard v. Mook, 550 So.2d 1208, 1210 (La.App.1989), writ denied, 556 So.2d 1283 (La.1990). La. R.S. 9:1102.1 specifically states that “[r]iparian owners ... shall have the right to erect and maintain on the batture or banks owned or leased by them and in the bed of the navigable river, lake, or stream adjacent to or adjoining such batture or banks, such wharves, buildings, or improvements as may be required for the purposes of commerce.... ” Thus, this statute ultimately recognizes the right of the riparian landowner to enjoy the benefits of commerce by his riparian ownership. Kliebert Educational Trust v. Watson Marines Services, Inc., 454 So.2d 855, 858 (La.App. 5 Cir.1984), writ denied, 457 So.2d 682 (La.1984), appeal dismissed, 471 U.S. 1050, 105 S.Ct. 2108, 85 L.Ed.2d *1166 474 (1985). This right is granted to no one other than the riparian owner. As a riparian property owner, plaintiffs have rights protected by Civil Code art. 667, which provides that a proprietor may not do anything on his property “which may deprive his neighbor of the liberty of enjoying his own” property.
Mr. Durant, president and managing partner of the defendant entities, clearly and unequivocally admitted to using plaintiffs’ riparian rights by mooring barges in front of the Phillip Family property on a frequent and continuous basis. He acknowledged that the barges remained in place for varying time periods, ranging from less than an hour to several hours. Johnny Riley, who worked at the subject property every day from about 2000 until about 2007, testified that barges were moored by defendants in the river in front of the Phillip Family property “just about every day.” Cary Burelle, general manager of Beverly Construction, testified that most of the time when he went to the Phillip Family property, barges |13were paralleling the shore of the property. He recalled two occasions when barges moored in front of the property prevented his employees from unloading rock barges. Mr. Burelle explained that although defendants did move the barges out of the way, it took a “couple of hours.” Mary Clulee testified that in the past ten years, more-often than not, there were barges tied to buoys floating in the river in front of the Phillip Family property. She explained that sometimes the barges were in place for a short amount of time, but at other times the barges remained docked for more than one day, sometimes up to four days at a time. Neal Clulee testified that over the past ten years, he had seen barges mooring and fleeting in front of the Phillip Family property approximately 15 to 20 days per month. Sometimes the barges were being moved, other times the barges and tug boats remained in place for a period of time. Luiz Martinez, the GIS manager for St. Charles Parish, testified as to aerial photographs of the Phillip Family property taken at random times in 2005, 2006, 2007 and 2009 depicting “structures” floating in the river in front of the Phillips family property. Robert Brennan, an employee of defendants, testified when they were building a tow or staging barges for a tow, they hung the barges off of the tier 5 buoy and these barges did extend out to the area in front of the Phillip Family property. He stated that this practice stopped in early 2010.
While the testimony adduced at trial indicates that there had been a verbal agreement between Mr. Durant and Mr. Phillip in which Mr. Phillip agreed to allow mooring of barges in front of his property, the evidence is clear that Mr. Phillip terminated this agreement by a letter written by an attorney on his behalf and received by Mr. Durant in February 2006. The evidence is equally clear that defendants did not stop mooring barges in front of the Phillip Family property after receipt of this letter; rather, they continued to do so until October 2010 when 114plaintiffs obtained an injunction prohibiting defendants from continuing this practice.
Plaintiffs’ riparian rights belong to plaintiffs. The expert appraisers testified that these riparian rights have monetary value in the form of lease payments for use of the rights. The testimony clearly shows that beginning in 2003, there was a verbal agreement between plaintiffs and defendants allowing defendants to use plaintiffs’ riparian rights. The testimony is equally clear that defendants continued to use *1167 plaintiffs’ riparian rights after being told by plaintiffs in February 2006 to discontinue this practice. Thus, the trial court properly awarded damages to plaintiffs for defendants’ use of plaintiffs’ riparian rights from February 2006 until October 2010.
Defendants also argue that plaintiffs did not lose lease revenues due to defendants’ barges being in front of their property because plaintiffs continuously used their property for commercial gain. This argument is without merit. Mr. Tatje, plaintiffs’ expert appraiser, testified that the highest and best use of this property includes barge fleeting and mooring. Mr. Oubre, defendants’ expert appraiser, also testified that the highest and best use of this property is the use of riparian rights for fleeting and mooring. Mr. Oubre qualified this testimony by explaining that it may not be economically feasible to lease this land as a “stand alone” property; rather it would be beneficial to have it leased as an appendage to an adjacent piece of property. However, he opined that the property could be leased for $10,695 per year.
The testimony presented at trial clearly established that the highest and best use of this property includes barge fleeting. However, the record indicates that plaintiffs could not engage in meaningful negotiations for the lease of the riparian rights appertaining to this property because they could not provide peaceable and | ^uninterrupted possession of the property to a potential lessee due to defendants’ frequent and continuous practice of mooring barges in front of the property and thereby blocking access to the property. Accordingly, the trial court properly awarded damages for loss of rental revenues to plaintiffs.
Defendants further argue that the trial court’s award of $14,000 per year in lost lease revenue is unsupported by the evidence. For the following reasons, we disagree. Mr. Tatje testified that the property could derive a fair market annual rental of $25,575 per year ($55 per linear foot along the river), which included more uses of the property than just the riparian rights for fleeting. Mr. Oubre testified that the property could derive a fair market annual rental value of $10,695 per year ($28 per linear foot along the river), based solely on the lease of riparian rights. Both appraisers testified at length as to leases of various properties along the river for prices that ranged from $7 to $89 per linear foot per year. In fact, defendants’ witness, Mr. Savoie, testified that he had recently negotiated a lease of a 545-foot piece of land fronting on the river for $41.65 per linear front foot per year. Further, Mr. Oubre admitted that his valuation did not take into account that the Phillips Family property had access to the River Road, which would command a higher rent. The trial court had all of this valuation information available to him from which to ascertain and determine in his own mind the fair market rental value of the Phillips Family property.
In considering expert testimony, a trial court may accept or reject in whole or in part the opinion expressed by an expert. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Lanasa v. Harrison, 02-0026 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605, unit denied, 02-2512 (La.11/27/02), 831 So.2d 286. The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and | ^judgment for that of an expert witness where, in the fact-trier’s opinion, such substitution appears warranted by the evidence as a *1168 whole. Green v. K-Mart Corporation, 03-2495 (La.5/25/04), 874 So.2d 888, 843; Barber Brothers Contracting Company v. Cuccia, 98-0675 (La.App. 1st Cir.4/1/99), 734 So.2d 820, 824, writ denied, 99-1258 (La.6/18/99), 745 So.2d 31. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion. Fishbein v. State ex rel. LSU Health Sciences Center, 06-0549 (La.App. 1st Cir.3/9/07), 960 So.2d 67, 73, writs denied, 07-0730, 07-0708 (La.6/22/07), 959 So.2d 495, 505.
Based on our review of the entire record before us and the applicable law, we find that the trial court did not abuse its broad discretion in awarding $14,000 per year in lease revenue to plaintiffs, as this award is fully supported by the evidence.
Finally, defendants argue that the trial court erred in dismissing their recon-ventional demand for damages to the tier 6 buoy caused by plaintiffs’ dredging. Mr. Durant testified that when plaintiffs started to dredge, the tier 6 buoy started to pull downriver. He testified that plaintiffs dredged over two million cubic yards of sand from in front of his property and it was logical to conclude that this is what caused the tier to move. Mr. Durant then admitted that he had no proof of this and did not think it was possible to prove that plaintiffs’ dredging caused the tier to move; rather he felt that it was “possible to assume it.” Thus, we find that the trial court had a reasonable factual basis for dismissing defendants’ reconventional demand for lack of proof.
In order to reverse a trial court’s finding, an appellate court must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the judgment is manifestly wrong. Stobart v. State Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Id. Considering the entirety of the extensive record before us, we find that the trial court’s judgment under review is fully supported by the evidence, had a reasonable factual basis, and was not manifestly erroneous or clearly wrong.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of the appeal are assessed to defendants.

AFFIRMED

. This injunctive relief granted in favor of defendants was clarified in a judgment on plaintiffs’ motion for new trial rendered on June 22, 2011.