JUDE G. GRAVOIS, Judge.
| ^Appellant, Dr. Kaleem Arshad, the husband of decedent, Dr. Jameela Arshad, appeals a judgment dismissing all of his claims against defendants, the Kenner Police Department, certain named officers, and their insurers,[1] which judgment found that defendants were not hable for the in-custody death of decedent.[2]
On appeal, appellant raises the following assignments of error:
1. The trial court erred in finding that the officers didn’t breach their duty to Dr. Arshad, and that their actions were reasonable under the circumstances;
2. The trial court erred in finding that F.S.O.P. 7-2.2[3] does not apply in this case because the court erroneously believed that Dr. Arshad’s arrest did not rise to the level of “maximum control” as contemplated by the rule; and
8. The trial court erred in finding that the manner in which Dr. Arshad was arrested, coupled with the failure of police officers to 14monitor her, were not a cause or contributing factor to Dr. Arshad’s death.
For the following reasons, we affirm the judgment of the trial court under review.

FACTS AND PROCEDURAL HISTORY

On January 10, 2005, Dr. Jameela Ar-shad died approximately nine minutes after being placed sitting and handcuffed in the back of a Kenner Police cruiser, after being arrested for failing to comply with police officer commands to step away from the victim of a traffic accident. At around 10:00 p.m. that evening, Dr. Arshad had witnessed the accident which involved a bicyclist and a car at the intersection of Williams Boulevard and West Esplanade Avenue in Kenner, Louisiana. Robert Evans, Jr., a Jefferson Parish firefighter/emergency medical technician (“EMT”), who was off duty at the time, also witnessed the accident and stopped to render aid to the cyclist.
Mr. Evans testified at trial that he was stopped in traffic at the intersection, saw the accident, exited his vehicle, and went to check on the victim. He got down on the ground in order to immobilize the victim in case he had injured his neck. As he was doing this, Dr. Arshad ran up between him and the victim and started shaking the victim violently, screaming and cursing at the victim in the process. She was described by various trial witnesses as large or obese,[4] and very irate at the time. When Mr. Evans asked Dr. Arshad to step back so she wouldn’t hurt the victim, she began screaming and yelling at him, grabbing him and screaming that she was a doctor, this was “her scene”, and’she was in charge. When he asked her what kind of doctor she was, she continued to scream that it was “her scene”; she did not identi *196 fy herself, or provide any medical credentials.
| .¡According to Mr. Evans, at this point two Kenner police officers came up and asked what was going on. He told them that the other person on the scene besides the victim claimed to be a doctor (later identified as Dr. Arshad) and had assaulted him and the victim. He described Dr. Arshad’s behavior as extremely angry and upset. Mr. Evans remembered that the two officers were talking to Dr. Arshad when an ambulance pulled up between him and her. He saw, under the ambulance, Dr. Arshad “go to the ground” and be handcuffed as he looked up. After that, he left the victim’s side because other EMTs had arrived. He gave his credentials to one of the officers and was released.
The first Kenner police officer to arrive at the scene of the accident was Officer Ryan Krummel, who arrived at 22:01 hours (10:01 p.m.). As he approached the scene, he saw the victim on the ground and two individuals near him, later identified as Mr. Evans and Dr. Arshad. Both were squatting near the victim, and the female, Dr. Arshad, was screaming at Mr. Evans. Mr. Evans told Officer Krummel that the female claimed to be a doctor, but would not produce any credentials. Officer Krummel testified that the female also started screaming at him, telling him that “this is my scene, I’m a doctor, I’m in charge” over and over again. Officer Krummel never saw the female calm down. He instructed both of the individuals not to touch the victim, and tried to talk to the female to diffuse the situation. At this point, Officer Gerald Miller of the Kenner Police Department approached the female. Officer Krummel heard Officer Miller tell the female that she would have to step away if she could not produce credentials. At that point, Officer Krummel saw the female grab “very aggressively” for the victim and Officer Miller grab her hand to prevent her from touching the victim. The female “swatted” at Officer Miller, shoving him. At this point, Officer Krummel turned to focus his attention to the accident scene.
|fiBecause the victim was bleeding, Officer Krummel went to his, police unit to retrieve some rubber gloves. As he was leaning into his car window to get the gloves, he saw the female and Officer Miller struggling against a minivan nearby. He testified that although neither party was throwing punches, there was definitely an altercation going on between the female and Officer Miller. He heard Officer Miller send out a “Code 108” over his police radio,' which meant that he needed assistance. When it appeared that Officer Miller had gained control of the female, Officer Krummel sent out a “Code 4” over his police radio, which effectively cancelled Officer Miller’s “Code 108” call.
Officer Krummel described the scene as very chaotic, in a very busy intersection, with at least ten civilians, many officers, two or three ambulances, and two or three police units present. The traffic was backing up, and the victim was being combative towards the EMTs.
As Officer Krummel was leaving his unit to go to Officer Miller’s unit to obtain more rubber gloves, he observed a renewed struggle between Officer Miller and the female, prompting Officer Krummel to call for more assistance. He then got the gloves he needed and headed to the victim, never seeing the female and Officer Miller again as far as the altercation between them was concerned. The next thing he remembered hearing was another officer asking if the female had been pepper-sprayed. Because he was not sure where the female was at this point, he asked the other officer who he was referring to. The other officer, John Louis, then showed him *197 the female in the back of a police cruiser belonging to Officer Kimberlyn Bright, where Officer Miller had placed her following her arrest. Officer Krummel shined his light into the car and saw the female with foam and fluids coming from her mouth. Because the car was locked, Officer Bright was summoned to unlock the door with her key. The officers then immediately began 17rendering aid to the female. Officer Krummel immediately radioed for another ambulance to come to the scene. One arrived a few minutes later. A paramedic on the scene took over care of the female at this point.
Officer Miller testified that he was the officer who arrested Dr. Arshad. Prior to becoming a police officer, he had been an EMT. He had been an officer with the Kenner Police Department for about a year when the incident in question occurred. He responded to the call' and parked his police unit somewhere in the intersection when he arrived at around 22:02 hours. He saw Officer Krummel kneeling down around something, and also saw Mr. Evans and Dr. Arshad kneeling as well. His initial impression was that Dr. Arshad was calm and not causing a disturbance. Mr. Evans told him that Dr. Ar-shad claimed to be a doctor, but would not provide credentials.[5]
When Officer Miller asked Dr. Arshad for her credentials, she said that she did not have them with her. He told her that she would have to step away from the scene, at which point she refused and made a move towards the accident victim. Officer Miller testified that he had a duty to the victim to remove Dr. Arshad because she would not produce identification or credentials. She did not obey his commands to step away, and kept yelling that it was “her scene.” When he first pulled her hands to take her away from the victim, his goal was to remove her until she could provide him with some identification. When he pulled her away, she shoved him,, at which point he felt that she had committed a battery upon a police officer.
Officer Miller tried to arrest Dr. Arshad by turning her around against a minivan, so that he could cuff her hands. She turned around facing him and began struggling with him. At this point, Officer Miller put out the first “Code 108” call, lsrequesting assistance, at 22:08 hours. This was the call that Officer Krummel cancelled when it appeared that Officer Miller had gained control of Dr. Arshad. However, she subsequently broke free and pushed him. At this point, Officer Miller executed a “leg sweep” maneuver, where he swept both of her legs .with one of his, to take her to the ground. He testified that as he was doing this, he also had a hold of her arm so that he could control her fall and lower her safely to the ground, which he did. He went down with her, rolled her onto her stomach, and sat on her buttocks near the small of her back. She did not try to twist away. He maintained a hold on her arm and instructed her to give him her other arm so that she could be handcuffed. As he tried to get her free arm, he shifted his weight to his leg. She did not follow his command to give him her free arm. Officer Miller then executed a “wrist lock,” which is a pain compliance technique. At this point, Dr. Arshad stopped resisting and Officer Miller was able to cuff her hands behind her back. He instructed her to roll onto her back, which she did. He assisted her to a sitting position and she then got up on her own. He then walked her to Officer Bright’s police unit, which was parked nearby.
*198 Officer Miller testified that Dr. Arshad was able to walk on her own to the police car, and was protesting the whole way, asking why he was doing this to her, that she was a doctor, and that she didn’t understand why this was happening. He brought her to Officer’s Bright’s vehicle because it was the closest vehicle and also because Officer Bright was a female officer. Officer Bright patted Dr. Arshad down and put her in the car, sitting up with her hands cuffed behind her.
After Dr. Arshad was put in the car, Officer Miller called for a ranking officer to come to the scene because of the arrest. The records shows that this call went out at 22:05 hours. Officer Miller testified that Dr. Arshad was not transported immediately to the station because the area in question was still a very ^active scene with a lot going on. Officer Miller did not remain by Officer Bright’s vehicle, but went to assist with the scene. He then heard someone ask if Dr. Arshad had been pepper-sprayed because she was foaming at the mouth.
Officer Bright testified that she responded to the first “Code 108” call sent by Officer Miller. The records show that she arrived at the scene at 22:04 hours. Officer Bright testified that she did not see the altercation between Dr. Arshad and Officer Miller or the actual arrest, nor did Officer Miller tell her about the altercation at that time. She was still in her vehicle when she saw Officer Miller walking Dr. Arshad in her direction. Dr. Arshad’s arms were behind her back _ and Officer Bright assumed that she was in custody. Officer Bright said that Dr. Arshad was walking under her own power, hollering “I’m a doctor” repeatedly. Officer Bright did a quick pat-down of Dr. Arshad and opened the back door of her unit. She had Dr. Arshad sit down' in the back seat, closed the door, and locked it from the button inside the car. She testified that the windows were up and the unit remained running. She stated that the heater was not on, but was not certain whether the air-conditioning was on.
Officer Bright then went to assist other officers directing traffic. She did not assign another officer to watch Dr. Arshad, she said, because she had no reason to suspect that Dr. Arshad needed medical attention, based upon her observations of her walking under her own power and hollering at the officers. Officer Bright testified that she was behind her car and could see the back of Dr. Arshad’s head. Officer Bright learned after the fact that Dr. Arshad had died at the scene.
Officer Louis arrived at the scene shortly after 22:07 hours, according to the records, from a nearby private detail. He testified that he came over in response to the first call for assistance by Officer Miller. He saw the paramedics working on the accident victim and observed them for several minutes. He noticed a silhouette |inmoving in Officer Bright’s police unit about 30 feet away, so he went to see who was in the car. He observed Dr. Arshad sitting in the back of the unit, upright and slightly sideways because of the handcuffs. He testified that her eyes met his eyes and they looked at each other. He knew she was in custody, so he did not open the door. He went back to ask why she was in custody, and then after learning why, walked back to Officer Bright’s unit, where he now observed froth coming from Dr. Arshad’s mouth, which was not present the first time he saw her. He tried to open the door, but it was locked. He was very concerned, so he looked for the first officer he saw and asked if she had been pepper-sprayed. He was told no, but was accompanied back to the car with another officer, both moving at a “fast walk.” He heard the officer ask for help. The officers then *199 got the door opened with a key, and pulled Dr. Arshad from the unit and started working on her.
Officer Louis testified that he was never told how Dr. Arshad was arrested. He was clear that the first time he saw her in the unit, she looked up at him, made eye contact with him, and there was no froth or fluids coming from her mouth.
Lt. Emile Sanchez was one of two night watch commanders who responded to the scene. He arrived at 22:10 hours and was being briefed by Officers Krummel and Miller when he heard Officer Louis ask if the “lady” had been pepper-sprayed. When Officer Krummel asked what lady and what car Officer Louis was referring to, Officer Louis led them to Officer Bright’s unit, where they saw Dr. Arshad sitting up straight with her eyes open and foam coming from her mouth. They discovered the unit was locked and called for Officer Bright to unlock it. A paramedic who was attending to the accident victim came over and assisted them with getting Dr. Arshad out of the car. Records introduced show that the second ambulance arrived at the scene at approximately 22:14-15 hours. Paramedics were unable to resuscitate Dr. Arshad. An autopsy revealed that she |nhad two kinds of heart disease: coronary artery disease and hy-pertrophic cardiomyopathy (an enlarged heart), of which she apparently was unaware.
Prior to the start of the trial, plaintiffs stipulated that the arrest of Dr. Arshad was legal and the level of force used to effectuate the arrest was reasonable. The sole issue before the trial court was whether the officers were negligent in not attending and observing Dr. Arshad after the initial “extremely physical, emotional and exertional arrest” and in leaving her cuffed and unattended in the locked police cruiser for approximately nine minutes.
At trial, plaintiffs argued that the physical nature of the arrest, with Officer Miller placing Dr. Arshad on the ground in a prone position and then sitting on her, caused her to suffer positional asphyxia, which, along with the officers’ failure to monitor her after she was placed in the police unit following arrest, contributed to her death.
After taking the matter under advisement and considering post-trial memoran-da filed by the parties, the trial court rendered judgment finding that defendants were not liable to plaintiffs for the injuries and ultimate death of Dr. Arshad. In his detailed reasons for judgment, the trial court stated:
The testimony at trial clearly established that it was the decedent’s behavior which precipitated the use of force in effecting her arrest, and that the officers acted reasonably under the circumstances.
The amount of force that was used in making the arrest did not rise to the level of a “maximum control situation,” which would mandate reference to Ken-ner Field Operating Standard Procedure (FSOP) 7-2.2, and require that the ar-restee not be left unattended in a closed vehicle.
The Court finds that the duty owed by officers to Dr. Arshad was to act reasonably under the circumstances. See Abraham v. Maes, 430 So.2d 1099, 1101 (La.App. 4th Cir.1983). Plaintiffs did not prove by a preponderance of the evidence that the officers breached their duty on the night in question. The evidence indicates that at most, decedent was left unattended for 9-10 minutes. There has been no |iashowing by the plaintiff that the officers had a duty to monitor an arrestee more frequently than that in a “non-maximum force arrest” situation such as this. In sum, the *200 Court finds that the officers acted reasonably under the circumstances. The arrest was effectuated quickly and with a minimal amount of force. The Court finds that the arrest was completed in less than two minutes. Further, based on the in-court demonstrations of the officers, there was no significant force applied to the decedent. The time that decedent was actually on the ground was less than one minute, and decedent was removed from the prone position as quickly as reasonably possible.
The Court does not find that' the officer’s actions caused positional asphyxia. After the brief struggle and arrest, decedent was not demonstrating any symptoms that would indicate to the officers that she was in need of additional observation or immediate medical attention.
Based on the foregoing findings, the Court finds that the defendants in this case are not liable to the plaintiffs for the injuries and ultimate death of Dr. Jameela[6] Arshad. The parties are each to bear their own costs unless otherwise mandated by. statute.
This timely appeal followed.
ASSIGNMENTS OF ERROR NUMBERS ONE AND . TWO
In his first assignment of error, appellant argues that the trial court erred in finding that the officers did not breach their duty to Dr. Arshad, and that their actions were reasonable under the circumstances. Appellant argues specifically that FSOP 7-2.2[7] created a special heightened duty on the part of the Kenner police officers to monitor Dr. Arshad closely after this “violent” struggle and arrest.
In his second assignment of error, appellant argues that the trial court erred in finding that FSOP 7-2.2 does not apply in this case because the court erroneously believed that Dr. Arshad’s arrest did not rise to the level of “maximum control” as contemplated by the rule. The trial court concluded, in its reasons for judgment, that based on the evidence and expert testimony, Dr. Arshad’s arrest did not constitute a maximum control situation.
[ iSBecause these two assignments of error are closely related, they will be discussed together.
A policeman must exercise reasonable care to preserve the safety of his prisoner. Abraham v. Maes, 430 So.2d 1099,1101 (La.App. 4 Cir.1983). That case and cases cited therein make clear that this duty is heightened if the officer has knowledge that the prisoner suffers from a medical condition, has been injured, or is intoxicated.
FSOP 7-2 is entitled “Use of Handcuffs” and its purpose is explained in Part 1 as “to establish guidelines for the use of handcuffs and restraining devices by members of the Kenner Police Department.” Part 2 explains that the Department has adopted the position that “handcuffs MUST and WILL be applied to a prisoner whenever possible, except when dealing with a young child.” Part 3 explains that this FSOP permits “limited discretion” in the use of handcuffs and restraining devices. Part 4, Guidelines for Applying Handcuffs, states that “Handcuffs shall be applied whenever any suspect ... is physi *201 cally arrested” and will be used “when the officer has reasonable cause to believe their use is necessary for the safety of the arrested person, the officer, or other persons, or when a physical arrest is authorized by law.” The officers in this case testified that they are required to use handcuffs in all arrest situations, except those involving a summons, no matter if the subject resists arrest,or not.[8]
FSOP 7-2.2 is entitled “Restraint Techniques and Devices in Maximum Control Situations.” The purpose, as explained in Part 1, “is to establish standards for the use of restraint techniques and devices by members of the Department where maximum control of a violent prisoner is required.” Part 2’s general discussion of this rule states that this procedural instruction will identify factors |M commonly found to precipitate “positional asphyxia” and provides guidelines to reduce the risk of such occurring.
At issue particularly in the application of these FSOPs was a determination of whether Dr. Arshad’s arrest constituted a “maximum control situation” as contemplated by the reading and application of the two FSOPs. Both plaintiffs and defendants presented expert witnesses who testified regarding that determination and the resultant application of FSOP 7-2 and 7-2.2.
The Call for Service (“CFS”) report, which was introduced into evidence, showed that Officer Miller arrived at the scene at 22:02 hours, and that Officer Bright arrived at 22:04 hours and was still in her car as Officer Miller was walking Dr. Arshad to the vehicle. Given their testimonies, it is evident that the arrest of Dr. Arshad was accomplished within this two-minute interval.
Officer Miller, who arrested Dr. Arshad, testified that Dr. Arshad’s resistance was in the form of turning around and trying to free herself while she was up against the van, which took place over a period of approximately 4-10 seconds. He said that at no time did Dr. Arshad run or try to run. He characterized her actions as resisting by trying to keep her hands out of his reach, not violence. He stated that the “leg sweep” and the wrist lock are arrest techniques, not control techniques, which he described as physical restraints such as handcuffs, leg shackles, or other devices meant to restrain an individual once arrested. Other than the “leg sweep” and the wrist lock, Officer Miller did not use any other techniques or devices to subdue Dr. Arshad.
Dr. Larry Gould, plaintiffs’ expert on police procedures, estimated that the total time of struggle was approximately 12-15 seconds. It was agreed that once Dr. Arshad was prone on the ground, she ceased struggling. He, however, characterized this encounter as a maximum control situation because the officer 115had to use physical contact with the subject over and above verbal commands to arrest her. He opined that both the “leg sweep” and the wrist lock are maximum control techniques. He also opined that Dr. Arshad’s arrest was a maximum control situation because her liberty was at maximum restraint after she was handcuffed and was put in the cruiser. Accordingly, he found that the officers violated FSOP 7-2.2. after this violent arrest by failing to monitor Dr. Arshad once she was placed in the cruiser, as required by Part 5.
Lloyd Grafton, defendants’ expert in police procedures, came to the opposite con- *202 elusion from Dr. Gould after reviewing all of the police reports and depositions. He found that Dr. Arshad’s arrest in no way-constituted a maximum control situation. He defined a maximum control situation as a life or death situation where officers have to subdue a subject who will not stay subdued. He described these subjects as kicking, fighting, biting, spitting, perhaps kicking the windows out of a police car, and who must be restrained by more devices than handcuffs. He said that Dr. Arshad’s arrest, where she resisted for a short time and was cuffed, after which she ceased resisting, was not a maximum control situation. She acted out verbally after being cuffed, but did not resist further in any way.
Douglas Dodt also testified for the defense. He said that he was a retired lieutenant with the Kenner Police Department and a professional standards officer. It was he who had developed FSOP 7-2.2 in conjunction with then Chief of Police Con-gemi, based upon research conducted by them. He did not testify as an expert, but as a fact witness. He stated that FSOP 7-2.2. was intended to apply in a maximum control situation where the officer would use extraordinary means, techniques, and devices to bring an extremely violent individual under control and maintain control over that individual in spite of repeated or contracted resistance on that individual’s part.
1fiIn Waguespack v. Sentry Select Ins. Co., 12-280 (La.App. 5 Cir. 11/13/12), 105 So.3d 880, 884-85, ivrit denied, 12-2700 (La.2/8/13), 108 So.3d 90, this Court explained the application of the manifest error rule to the evaluation of witnesses’ testimonies, to-wit:
Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. The manifest error standard therefore demands great deference to the trier of fact because it is the trier of fact who is aware of variations in demeanor and tone of voice that bear considerably on the listener’s understanding of what is' stated.
Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. It is only where or [sic ] objective evidence so contradicts a witness’s testimony, or the testimony itself is so' internally inconsistent or implausible on its face that a reasonable factfinder would not credit it, that the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. Where such factors are not present and a factfinder’s determination is based upon a decision to credit the testimony of one or more witnesses, the decision can virtually never be manifestly erroneous or clearly wrong.
(Citations omitted.)
Additionally, in Phillip Family L.L.C. v. Bayou Fleet P’ship, 12-565 (La.App. 5 Cir. 2/21/13), 110 So.3d 1158, 1167-68, writ denied, 13-0641 (La.4/26/13), 112 So.3d 846, this Court explained the standard of appellate review of a trial court’s findings of fact based on expert testimony, to-wit:
In considering expert testimony, a trial court may accept or reject, in whole or in part, the opinion expressed by an expert. The effect and weight to be given to expert testimony is within the *203 broad discretion of the trial judge. The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier’s opinion, such substitution appears warranted by the evidence as a whole. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion.
117(Citations omitted.)
Upon review, after considering the entirety of the evidence and testimony presented at trial, we find that the trial court made reasonable evaluations of credibility and reasonable inferences of fact in reaching its factual conclusions. Further, the trial court did not abuse its broad discretion is crediting the testimony of defendants’ expert witnesses over that of plaintiffs’ expert witnesses. Accordingly, the trial court was not manifestly erroneous in concluding that Dr. Arshad’s arrest did not constitute a maximum control situation as contemplated by FSOP 7-2.2. As such, there was no heightened duty towards Dr. Arshad. The officers only had the legal duty to be reasonable under the circumstances, as was properly found by the trial court.
These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER THREE

Appellant also argues that the trial court erred in finding that the manner in which Dr. Arshad was arrested, coupled with the failure of the police officers to monitor her, were not a cause or contributing factor to Dr. Arshad’s death. Appellant argues that there was a duty to closely monitor Dr. Arshad after she had been arrested and placed in the back of the police car, and that the failure to monitor her after her arrest caused or contributed to her death, and that she suffered a lost chance of survival due to the officers’ negligence.
Here, appellant argues that Dr. Arshad suffered from positional asphyxia from Officer Miller sitting on her abdomen while he was arresting her. However, Officer Miller testified that he sat on Dr. Arshad’s buttocks near the small of her back so as not to compress her abdomen.[9] Further, he and Officer Bright both | ^testified that after Dr. Arshad was upright and walking to Officer Bright’s car, she continued to yell and loudly protest her arrest. Expert testimony provided at trial found that a person suffering from positional asphyxia could not have been moving the large amounts of air in her lungs that Dr. Ar-shad was, as evidenced by her continued yelling and protesting as she walked to the car.
Alternatively, appellant seems to argue that the extreme physical nature of Dr. Arshad’s arrest required her to be continuously monitored while in the police car, citing FSOP 7-2.2. This argument is without merit. The finding by the trial court that Dr. Arshad’s arrest was not a maximum control situation, coupled with evidence that she was breathing well enough to yell at officers, did not require that the specific monitoring requirements of FSOP 7-2.2. be observed, as testified to by defendants’ expert and fact witnesses.
*204 Both Officers Miller and Bright testified that Dr. Arshad exhibited no signs after her arrest that she needed any medical assistance. Officer Louis, who observed Dr. Arshad in the back of Officer’s Bright’s police unit, testified that the first time he saw her, she looked up at him and their eyes met, and that she was in no apparent physical distress. He did not observe any fluids coming from her mouth at that time. He observed her about two minutes later, after he had walked over to other officers to inquire about her and walked back, and only then did he see that she had fluids coming from her mouth.
Appellant also claims that the arrest was extremely physical for Dr. Arshad, given that she was middle-aged and obese. However, the evidence shows otherwise. The entire arrest was accomplished within approximately two minutes, with the resistance portion of the encounter lasting from 4-10 seconds (Officer Miller’s testimony) to 12-15 seconds (Mr. Gould’s testimony). The evidence |1;,showed that Dr. Arshad did not run away, nor attempt to run away; her resistance constituted one and possibly two “shoving” motions at Officer Miller, and attempts to evade him while the two of them were upright against the minivan. Officer Miller’s move bringing Dr. Arshad to the ground required no exertion on her part, and her fall was carefully controlled by Officer Miller. Other than refusing to give her other arm until he applied the wrist lock, Dr. Arshad’s only other exertion was rolling to her back, sitting up, and walking to the car. Even given Dr. Ar-shad’s age and size, the testimony of the officers indicates that extreme physical exertion was not involved in this arrest. Upon review, we find that the trial court was not manifestly erroneous in crediting this testimony and making this finding of fact.
The autopsy evidence showed that Dr. Arshad suffered from two cardiac conditions of which she apparently was unaware: coronary artery disease and hyper-trophic cardiomyopathy (an enlarged heart). These two conditions, apparently unfortunately exacerbated by Dr. Arshad’s irate emotional state exhibited throughout the entirety of her presence on the accident scene, were found by defendants’ expert cardiologist to be factors contributing to her death, given the evidence contraindicating positional asphyxia.
This assignment of error is without merit.

CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the trial court under review is affirmed, with each party to bear their own costs.

AFFIRMED.

. The following were named as party-defendants in this proceeding, to-wit: Nick Conge-mi, in his official capacity as Chief of Police for the City of Kenner, the City of Kenner, Kenner Police Department, Officer Gerald Miller, Officer Ryan Krummel, Officer Kim-berlyn Bright, Sergeant Emile Sanchez, Gemini Insurance Company, and Clarendon America Insurance Company.

. According to the record, Nadeem S. Arshad, the son of decedent, Dr. Jameela Arshad, was also a party-plaintiff in this proceeding, but did not appeal the trial court judgment at issue. Accordingly, Dr. Kaleem Arshad is the only appellant herein.

. ‘‘FSOP” stands for Field Standard Operating Procedure.

. Evidence at trial established that Dr. Arshad was around 5 feet 3 inches tall and weighed approximately 225 lbs.

. Officer Miller testified that he never had tíme to ask Mr. Evans for his credentials.

. The original reasons for judgment stated decedent's first name as being "Kaleem” instead of ''Jameela.” The reasons for judgment were amended to provide the correct name of decedent.

. The record reflects that this exhibit was extensively discussed at trial, but was never actually introduced into evidence.

. The officers testified that there were exceptions to this rule, such as for the arrest of a young child, which did not apply in this case.

. Appellant has made much of the fact that Officer Miller claimed to be only generally familiar with positional asphyxia and further could not remember having been instructed as to the particular policies of FSOP 7-2.2. However, Officer Miller testified that he was an EMT before becoming a police officer and understood what positional asphyxia was and that it should be avoided in arrest situations.