JUDE G. GRAVOIS, Judge.
|a Defendant/appellant, Bankers Specialty Insurance Company (“Bankérs”), plaintiffs’ homeowners’ insurance carrier, seeks appellate review of a judgment in favor of plaintiffs/appellees, Russell and Tracy Var-mall (“the Varmalls”), finding Bankers liable to the Varmalls for damages to their home resulting from Hurricane Isaac. In a bench trial, the judge also found' that Bankers was arbitrary and capricious for its failure to timely adjust the Varmalls’ loss and pay the claim, and thus was in bad faith pursuant to La. R.S. 22:1892. The-trial court awarded the Varmalls a total sum of $50,000.00, plus interest and costs, without itemization, the Varmalls having stipulated that their damages did not exceed this principal amount. For the reasons that follow, we affirm the trial court’s judgment in favor of the Varmalls.
FACTS AND PROCEDURAL HISTORY
The Varmalls are the owners of a home located at 829 Cameron Court in Kenner, Louisiana, that sustained damages in Hurricane Isaac, which struck the area on or about August' 29, 20Í2. The Varmalls did not evacuate for the storm ^because Mr. Varmall, who was employed as a detective by the Jefferson Parish Sheriffs Office, was required to stay in the area during the storm as part of his work duties. Mr. Varmall testified that- he and his family remained in the home during the entire storm. The Varmalls’ home was insured by Bankers for wind damage, as evidenced by. the policy introduced into evidence at trial; The Varmalls also had flood .coverage on their home with New Hampshire Insurance Company.
The Varmalls initially made claims to Bankers after Hurricane Isaac, which included damages to their roof and attic, water damage to their living room ceiling from a roof leak, damages to their fence, and a claim for spoiled food. They first contacted Bankers on September 4, 2012. Lennette Conn, an independent adjustor employed by Diversified Adjustors and hired by Bankers to adjust claims for this storm, inspected the property on September 12, 2012. These claims were adjusted in a timely fashion and are not at issue in this case.
At issue in this ease is the Varmalls’ supplemental claim for damages to their wood floors.[1] A few days to a week after Ms. Conn first inspected their property, Mr. Varmall noticed that his wood floors were cupping and buckling. The buckling *183 was very evident in doorways, as doors could not close over the swollen floor boards, but the cupping was noticed throughout most rooms. Mr. Varmall called Ms. Conn to report' the flooring problem. She told him that he must first report it to Bankers, who could then schedule her to reinspect the property, which she did on October 4, 2012. Ms. Conn concluded that the floor damages were caused by a flooding event as defined in the policy, and thus denied the claim under a policy exclusion.
JjMr'. Varmall testified that Bankers told him to make a claim to his flood carrier, so he did. This claim was dented on the basis that there was no general condition of flooding in their area or at this particular risk during Hurricane Isaac. The Var-malls appealed this decision and filed a claim with FBMA. These, too, were denied.
The Varmalls filed suit against Bankers on August 27, 2013, seeking damages for Bankers’ failure to pay their claim for damages to their wood floors. Prior to trial, the Varmalls stipulated that their damages did not exceed $50,000.00, exclusive of interest and costs. The matter proceeded to a bench trial on October 21, 2014. At the conclusion of the- trial, the court ruled -from the bench, finding that the Varmalls proved that their losses were covered under the Bankers policy, that the Varmalls proved damages in excess of $50,000.00, and that Bankers had been arbitrary and capricious in failing to timely adjust the Varmalls’ loss and was thus in bad faith under La. R.S. 22:1892, The trial court awarded the Varmalls damages in the amount of $60,000.00, plus interest and costs. Bankers filed a motion for suspensive appeal, which was granted. This appeal followed.
On appeal, Bankers first argues that the trial court erred in finding that the damages to the Varmalls’ home were covered by their homeowners’ policy, rather than under their flood policy. Next, Bankers argues that the trial court erred in awarding $50,000.00 in damages when the only competent evidence indicated that the Var-malls’ damages were only $20,778.44. Finally, Bankers argues that the trial court erred in finding that it was arbitrary and capricious in failing to timely adjust the Varmalls’ claim..

J^TANDABI) OF REVIEW

In Arshad v. Congemi, 14-87 (La.App. 5 Cir. 10/29/14), 164 So.3d 198, 202-203, this Court outlined the standard of appellate review regarding witness testimony and the consideration of expert testimony:
In Waguespack v. Sentry Select Ins. Co., 12-280 (La.App. 5 Cir. 11/13/12), 105 So.3d 880, 884-85, writ denied, 12-2700 (La.2/8/13), 108 So.3d 90, this Court explained the application of the manifest error rule to the evaluation of witnesses’ testimonies, to-wit:
' Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not-be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for- this principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. The manifest error standard therefore demands great deference to the trier of fact because it is the trier of fact who is aware of variations in demeanor and- tone of voice that bear considerably on the listener’s understanding) of what is stated.
*184 Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. It is only where or [sic] objective evidence so contradicts a witness’s testimony, or the testimony itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it, that the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. ■ Where such factors are not present and a factfinder’s determination is based upon a decision to credit the testimony of one or more witnesses, the decision can virtually never be manifestly erroneous or clearly wrong. (Citations omitted.)
Additionally, in Phillip Family L.L.C. v. Bayou Fleet P’ship, 12-565 (La.App. 5 Cir. 2/21/13), 110 So.3d 1158, 1167-68, writ denied, 13-0641 (La.4/26/13), 112 So.3d 846, this Court explained the standard of appellate review of a trial court’s findings of fact based on expert testimony, to-wit:
In considering expert testimony, a trial court may accept or reject, in whole or in part, the opinion expressed by an expert. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier’s opinion, such ^substitution appears warranted by the evidence as a whole. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its broad discretion.

ASSIGNMENT OF ERROR NUMBER ONE

Liability

Bankers first argues that the trial court ignored the “overwhelming weight” of evidence that the Varmalls’ floor damages were caused by a flood event as defined in the Bankers, policy, and thus were not covered under the Bankers policy. This evidence consisted of Mr. Varmafl’s own statements under oath, as well as his sworn proof of loss statement made to his flood carrier, as well as the testimony and report of Fred Vanderbrook, Bankers’ expert engineer who inspected the property in July of 2014. Bankers argues that Mr. Varmall was not a credible witness, as he made conflicting statements about the cause of the loss, in his deposition and at trial, as well as in his sworn proof of loss statement to his flood carrier.
The Bankers policy issued to the Var-malls contained the following exclusion from coverage:
3. Water damage
Water Damage means:
a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
b. Water or water-borne' material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or
c. Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;
caused by or resulting from human or animal forces or any act of nature.
|7Pirect loss by fire, explosion or theft resulting from water damage is covered.
*185 Bankers claims that Mr. Varmall stated under oath that the water damage to his flooring was caused by either standing or ground water entering his home through weep holes in the brick fagade. Bankers also focuses on the sworn statement of loss that 'Mr. Varmall provided to his flood carrier, claiming that his damages were caused by a flood event as defined in the flood policy. Bankers asserts that at trial Mr. Varmall claimed, instead, that the damages were caused by excess moisture in the home caused by water intrhsion through the roof leak, and the presence of saturated towels used to soak up water in the attic, exacerbated by the lack of air-conditioning in the home for approximately 10-14 days during and immediately after the storm before power was restored, as claimed by the Varmalls’ expert in moisture management and abatement, Michael Gurtler.
The trial court, in its ruling from the bench, specifically found that Mr. Varmall was a credible witness.' For the following reasons, we see no reason to disturb the trial court’s conclusions regarding Mr. Varmall’s credibility.
Mr. Varmall testified at length regarding the claims process with both Bankers and his flood carrier. He testified that his home flooded in Hurricane Katrina and he lost everything. He had the drywall gutted to four feet and all of the floors replaced. Since then, he never had a problem with the floors buckling or separating until Hurricane Isaac.
Mr. Varmall testified that Hurricane Isaac “hovered” around his house for three to four days. His roof developed a leak on the left side of the house, in the attic. He attempted to stop the leak with towels, but upon realizing he didn’t have a machine to wash the saturated towels, he placed a bucket in the attic under the leak. He had to empty the bucket every two hours or so. After working a 12-hour 18shift, he arrived home one day to find that the water had seeped through thé ceiling onto his hardwood floors. He located the leak on top of his roof and twice applied a sealant to the exterior of' the roof to stop the leak. When Ms. Conn arrived the first time to inspect the Varmall home shortly after the hurricane, the- floors had not yet buckled. Mr. Varmall testified that a few days after Ms. Conn first inspected the' house, the floors began to buckle. ■
Mr. Varmall immediately called Bankers to report the floor damages. He was told by someone on the phone that “they were not covering any more losses.” He was also told to contact his flood carrier, which he did. He made a claim with his flood carrier, who sent an adjustor out on September 30, 2012, who said immediately that it was not a flood claim, and told Mr. Varmall to contact his homeowners’ carrier. The flood carrier formally denied the claim on October 4, 2012, stating that the claim was denied because there was no general condition of flood in the area or at this particular risk (the covered property).
Mr. Varmall then contacted Bankers and Ms. Conn directly. He testified that Ms. Conn came back to his house on October 4, 2012, to inspect the damage to his floors. She took pictures of the floors and agreed that they were damaged. Thereafter, Mr. Varmall was notified by Bankers that it was not going to cover the damages. He said that Bankers never sent anyone else to inspect his property. The Varmalls did not make- another claim with their flood carrier. ■
Mr. Varmall was asked about Mr. Van-derbrook’s. report from 2014 that suggested the Varmalls’ property had a drainage issue. The Varmalls’ neighbor to the left had his home raised 2-3 feet higher than the Varmalls’ home following Hurricanes Cindy and Katrina.' Mr. Varmall installed *186 a subsurface drainage system' that was duly noted by each adjustor and inspector who visited the property following Hurricane Isaac. Mr. Varmall asserted that he was at the property. during 1 «Hurricane Isaac and never noticed any" water coming in through the doorways or coming up from the ground into his home. He never saw the drainage system back up. ■ He denied knowledge of how water might have come into his home through the weep holes in the brick. He testified that he was told that by an adjustor, but never witnessed it. He denied being told by the flood adjustor that he had a drainage problem on the side of his house.
Mr. Varmall testified that he did not know what to do, because his flood carrier was telling him that it was a homeowners claim and his homeowners’ carrier was telling him that it was a flood claim. He got in touch with his insurance agent, who recommended that, he call an independent adjustor, Mr. Richard Lyon. Mr. Lyon came out to the house and inspected the floors. He wrote a loss sheet that provided an estimate for replacement of the wood floors. Mr. Varmall signed that estimate and submitted it to FEMA. Mr. Varmall testified that he was not an engineer and had no training in construction or flood adjustment, and thus was unable to form an opinion as to the exact cause of his floor damages. He testified that he submitted a flood claim because Bankers told him to do it and because he was trying to protect his family.
After thorough review, we find-no abus.e of discretion in the trial court’s finding that Mr. Varmall was a credible witness and that his actions and statements made in the context of his insurance claims were done in good faith. ,,
■ Likewise, the trial court had two expert opinions upon which to draw to form hia conclusions regarding whether the Var-malls’ floor damages were caused -by a-covered. peril under the Bankers policy. First, it is noted that the Varmalls’ flood claim was rejected by the flood carrier on the basis that there was no general condition of flooding in the area or at the covered risk. Mr. Vanderbrook, Bankers’ expert, did not inspect the property until almost two years after the | mhurricane. He theorized that the floor damages were caused by the drainage system backing up, causing water to accumulate and enter through the weep holes in the brick fagade. However, as pointed out under cross-examination, Mr. Vanderbrook performed no tests of the drainage system, and acknowledged that he- had no evidence that the .drainage system actually failed in this case. He did not ascertain, through meteorological data, the amount of rainfall in the area during the hurricane. He failed to speak to any witnesses who were in the area during the hurricane, other than Mr. Varmall, who could have told him about any localized standing water or .flooding,
Mr. Gurtler, the. Varmalls’ expert in moisture management and abatement, testified that in thousands of post-Katrina inspections of structures, he had never seen a situation where water entered a structure through weep holes, yet had not left any type of mark or water line along the exterior- wall where the water had entered. He also noted the lack of stains or wicking marks on the sheetrock on the left side of the house, which is what he would have expected' to see if the water had entered on that side, as theorized by Mr. Vanderbrook.[2] Mr. Gurtler also noted that buckling' of the floors was more pro *187 nounced in the middle of the house, rather than on the left side where the water allegedly entered, which is contrary to what he would have expected to see had water in fact entered on. the left side. Mr. Gurtler theorized that the buckling of the floors was caused by the increased moisture levels in the house caused by the water intrusion through the documented roof leak combined with the lack of air-conditioning in the house for 10-14 days during and immediately after, the storm while the power was out.
The trial court gave more credence to Mr. Gurtler’s expert opinion regarding causation than Mr. Vanderbrook’s. It is clear, from our review, that the physical |nevidence, such as the lack of water lines on the exterior of the property and well as in the interior, coupled with the location and degree of buckling of the floors concentrated in the center of the house rather than on the left side where the water intrusion was alleged to have occurred, plus a complete lack of evidence that the subsurface drainage system backed up or failed, indicates- that the trial court was not manifestly erroneous in its conclusion that the Vannalls’ floor damages were not caused by a flood event as defined in the Bankers policy exclusion quoted above. That being the case, we find no error in the trial court’s finding that Bankers was liable for the Varmalls’ floor damages resulting from Hurricane Isaac under the homeowners’ policy issued by Bankers to the Varmalls. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO

Damages

Bankers next argues that the trial court erred in awarding the Varmalls the total sum of $60,000.00, as per their stipulation as-to damages, when the only competent evidence in the record showed that the Varmalls’ damages did not exceed $20,778.44. A thorough review of the evidence, however, supports the trial court’s finding -that the Varmalls’ damages exceeded $50,000.00,
Bankers argues that the only competent evidence of the Vannalls’ damages for the wood floors was supplied by Mr. Lyon, the independent adjustor hired by the Var-malls, who estimated the cost of the materials to replace the Varmalls’ floors at $22,778.44.[3] Bankers argues that Mr. Conn’s estimate of damages, the one used by the trial court, totaling over $84,000.00, is “worthless” because it also provided estimates ;for damages not claimed by the Varmalls, replacing. drywall I ^throughout the house, as .well as replacing tile floors in the two bathrooms, kitchen, and entryway.
When ruling from the bench, the trial court cited Mr. Conn’s estimate, but also noted that certain items of damage estimated therein were speculative. Upon review, we find that the Varmalls never claimed damages for drywall, nor for tile floors, nor were those items proven in this case to be attributable to Hurricane Isaac. We have reviewed Mr. Conn’s estimate very closely. Far from being “worthless,” it itemizes the damagés for each room individually and breaks down by line item each aspect of the materials and work for the repairs. We have subtracted from Mr. Conn’s estimates of materials’ cost in his estimate for the kitchen, bathrooms, and entryway in their entirety (totaling $39,636.88), because these rooms are indicated to have tile floors. Additionally, we *188 have subtracted from each remaining room estimate those line items that appear to pertain solely to drywall replacement. Our calculations show that Mr. Conn’s estimated costs of replacing the wood floors comes to $22,983.06, which is quite close to Mr. Lyon’s estimate, rendered two years previously, of $22,778.44.
However, Mr. Conn’s estimate also included other items. First, he included “adjustments” to the basic charges, totaling $1,236.00. Bankers has not provided this Court with a basis to eliminate this charge. Subtracting from this total items therein that appear to be related to the tile and drywall, we are left with applicable adjustments of $494.53. Second, Mr. Conn’s estimate also included $26,169.20 in costs to pack out the Varmalls’ household effects, store them, and return them to the home after the floors were completed. Beyond protesting the total amount of damages, Bankers failed to refute these charges or substantively contest them. The trial court apparently accepted the Varmalls’ position that this would be the most efficient, safe, and cost-effective way of handling the matter, rather than | ^continually moving the Varmalls’ furniture from room to room as work progressed. Accordingly, we agree that the Var-malls are entitled -to this award as an element of their damages.
Therefore, at this point, we have calculated the Varmalls’ damages to be $49,646.79, prior to adding sales tax of 9% on the new (and lower) amount of materials, as well as 10% overhead and 10% profit on the new lower amount, as per Mr. Conn’s estimates. This damages calculation also does not yet include any amounts the Varmalls are entitled to for the finding that Bankers was arbitrary and capricious, and thus in bad faith, in failing to timely adjust their claim under La. 22:1892, discussed infra. Under the circumstances of this case, however, no further calculations are necessary. For the foregoing reasons, we find that the trial court did not err in concluding that the Varmalls provided ample proof that their damages exceeded $50,000.00. In light of the fact that the Varmalls stipulated that their damages did not exceed this amount, we find no error in the award of $50,000.00 to the Varmalls, exclusive of interests and costs. This assignment of ei'ror is without merit.

ASSIGNMENT OF ERROR NUMBER THREE

Damages for violation of La. R.S. 22:1892

In its final assignment, Bankers argues that the trial court erred in finding that it violated La. R.S. 22:1892 by arbitrarily and capriciously failing to adjust the Varmalls’ loss in a timely manner. Bankers points to the fact that the Var-malls’ initial claims were adjusted within the statutory time frame. Bankers argues that penalties and attorney’s fees are inappropriate when the insurer has a reasonable basis to defend a claim and acts in good faith reliance on that defense. Bankers argues that it properly relied on Mr. Varmall’s sworn statements, to his flood carrier, that the loss was due to flooding. Bankers also cites the report of Mr. | uVanderbrook, its engineer, who inspected the property in July of 2014, approximately two years after the loss. Bankers claims that there was no evidence that wind-driven rain caused the water intrusion into the Varmalls’ home, but rather the evidence supports the conclusion that the damages were caused by flood waters.
In the first assignment of error, supra, this Court concluded that the evidence clearly showed that no flooding event occurred as defined in the Bankers policy, and that Mr. Varmall’s seeming statements to the contrary were explained by *189 theories Mr. Varmall heard from adjustors, and by Bankers’ rejection of his claim and its suggestion that he turn to his flood carrier for coverage.
La. R.S. 22:1892 provides, in pertinent part:
A.(l) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 22:1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.
(2) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, R.S. 22:1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any third party property damage claim and of any reasonable medical expenses claim due any bona fide third party claimant within thirty days after written agreement of settlement of the claim from any third party claimant.
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant except that the commissioner may promulgate a rule for extending the time period for initiating a loss adjustment for damages arising from a presidentially declared emergency or disaster or a gubernatorially declared emergency or disaster up to an additional thirty days. Thereafter, only one additional extension of the period of time for initiating a loss adjustment |1smay be allowed and must be approved by the Senate Committee on Insurance and the House Committee on Insurance, voting separately. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1973.
(4)All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
. (B)(1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) of this Section, respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2) of this Section when such failure, is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, *190 payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to bé due as well as reasonable attorney fees and costs. Such. penalties, if awarded, shall not be,used by the insurer in computing either past or prospective loss experience, for the purpose of setting rates or making rate filings.
* * * ■
It is undisputed that Bankers originally told the Varmalls to make a claim with their flood carrier for their floor damages. Once that claim was denied after the flood carrier concluded that no general flooding, occurred in the Varmalls’ area or at this particular risk, Bankers sent Ms. Conn to inspect the Varmalls’ floor damages. Ms. Conn agreed'that in her prior inspection, the floors exhibited no buckling, cupping, or other damage. Ms. Conn testified that she did not read the Bankers policy exclusion regarding .flood events. She testified that she was a licensed adjustor and estimator, but had no expertise or training in engineering, construction, or determining the cause of.damage at properties. She admitted that |1fishe could not determine the difference between wind-driven rain and flood. She had never 'been qualified as an expert in a court of law.
Ms. Conn testified that she did not estimate the damage to the floor, because she could not determine where the water had entered the house, and therefore believed it was caused by flooding. She agreed that she saw the stain on the living room ceiling and knew that water had intruded there. She did not take any further steps to determine the source of the water intrusion. She did not go into the attic. She did not perform any tests to determine if moisture was present in the walls or the floor. Bankers did not investigate this claim any further or take any steps to determine the source of the flooring damages until it hired Mr. Vanderbrook to inspect the property in July of 2014. It is obvious that Bankers, denied the Varmalls’ claim on the recommendation of Ms. Conn, who had no expertise in determining the cause of damages, only of estimating them.
The facts above fully support the trial court’s conclusion that Bankers was arbitrary and capricious pursuant to La. fi.S. 22:1892. Such a finding entitles the Var-malls to an award of 50 per cent of their damages, or $1,000.00, whichever is greater. We see no manifest error in the trial court’s finding in this regard.

CONCLUSION

The trial court’s judgment in favor of the Varmalls in the amount of $50,000.00 is affirmed. All costs of this appeal are assessed to Bankers.

AFFIRMED

. The home had real wood floors (not laminate) throughout the house, except in two bathrooms, the entry way, and the kitchen. Previously, tire home had sustained flood damages during Hurricane Katrina in 2005, As a result, all of the floors in the home had been replaced following that storm.

. No adjustor or expert who inspected this property noted any sort of water line or flood line on the outside of the home or wicking stains or a water line on the inside on the baseboards or sheetrock.

. Bankers lowered this amount by $2,000.0(1, allegedly the amount of the Varmalls’ deductible. However, the deductible for the Var-malls’ Hurricane Isaac loss was previously applied to the original claim, and thus it is not' appropriate to deduct it again.