MOLAISON, J.
*1066 Plaintiff/Appellant, Ammar Investments, LLC d/b/a Zegar, Inc. and d/b/a Fouad & Faris, Inc. ("AI"), appeals the trial court's judgment awarding it $26,654.10 in damages for loss of personal property as a result of Hurricane Isaac, but denying its claim for damages sustained to the roof of its building. AI also appeals the trial court's denial of its motion for new trial and/or rehearing of a prior judgment granting summary judgment in favor of defendant, Certain Underwriters of Lloyd's, London ("Underwriters"), and dismissing AI's claim for bad faith damages due to Underwriters' alleged misrepresentation of its policy provisions pertaining to the hurricane deductible. Underwriters filed a cross appeal seeking reversal of the trial court's award to AI for loss of its business inventory. For the following reasons, we affirm the trial court's judgment in part and reverse in part.
FACTS AND PROCEDURAL HISTORY
Ammar Zughayer is the owner of AI, which owns and operates Mike's Food Mart, a convenience store and gas station located on River Road East in Garyville, Louisiana. Mike's Food Mart was insured against building and personal property (inventory) loss under a policy of insurance issued to AI by Underwriters ("the Policy").[1] The Policy, which required a three percent (3%) wind and hail deductible, was effective from June 8, 2012 to June 8, 2013; its coverage included a $300,000.00 limit for damages occasioned to the building, and a $200,000.00 limit for loss of personal property located on the premises.[2]
On August 28-29, 2012, Hurricane Isaac made landfall in St. John the Baptist Parish causing widespread power outages throughout the parish. These power outages caused the coolers and freezers at Mike's Food Mart to shut down. Following the storm, Mr. Zughayer filed a claim under the Policy on behalf of AI averring that Mike's Food Mart sustained both building and personal property damage as a result of the hurricane's "wind, tornadoes, rain, and/or wind driven rain."
Underwriters retained SyNerGy Adjusting Corporation to investigate Mr. Zughayer's claims. On September 8, 2012, SyNerGy's senior claims' adjuster, Mike Dossett, inspected the property and assessed the damages. Specifically, Mr. Dossett inspected the outside of the building, which he noted was newly constructed, and observed the canopies, awnings, gas pumps and signs. In doing so, he discovered only minimal damage to the metal fascia of the canopy situated over the diesel pumps. Mr. Dossett then inspected the inside of the building, which he found to be in good condition and well-stocked. Mr. Zughayer *1067 identified for him two areas of the store where he claimed water was leaking through the roof: (1) in between a walk-in cooler and a back wall, and (2) around a hood vent positioned over cooking equipment in the kitchen. Mr. Zughayer then showed Mr. Dossett the store's inventory that was damaged, which included food and drinks that were spoiled as a result of the power outage.
Mr. Dossett found the building to be in "excellent condition" and determined that the covered damages to the premises were minor. Mr. Dossett provided Mr. Zughayer with a Contents Loss Claims Sheet with instructions to itemize any inventory and contents losses.[3] By letter dated September 28, 2012, Mr. Dossett informed Mr. Zughayer that his "initial inspection" of AI's loss to the building indicated that the damages did not exceed the Policy's 3% hurricane "deductible of $15,000.00."[4] Mr. Dossett also advised Mr. Zughayer that if he disagreed with the assessment, he was encouraged to forward any "competitive, detailed estimates for ... review and further consideration." No estimates for building damages, nor a completed itemized list of damaged contents, were ever provided by Mr. Zughayer to Mr. Dossett during the adjustment period. Several months later, having heard nothing further from Mr. Zughayer, Mr. Dossett closed the file on AI's claim.
On September 27, 2013, AI filed suit against Underwriters seeking recovery for damages to the building and personal property (i.e. , business inventory) caused by Hurricane Isaac. AI sought additional damages claiming that Underwriters acted in bad faith and was "arbitrary and capricious" in adjusting its claim and refusing to pay for its property damage. The matter proceeded to a two-day trial held on September 18 and 19, 2017.[5] At its conclusion, the trial court took the matter under advisement and later issued judgment on February 9, 2018, with written reasons. The trial court denied AI's claim for damages to the building on the basis that AI failed to adduce sufficient evidence to satisfy its burden of proving that damages were sustained to the building's roof, canopies or signs. Despite its rejection of AI's claim for damages to the building's roof caused by the hurricane, the trial court awarded $26,654.10 to AI for the cost of replacing its water-damaged tobacco inventory (less the 3% hurricane deductible), which was stored in the attic directly underneath the roof.
The instant appeal and cross appeal ensued.
ASSIGNMENTS OF ERROR
On appeal, AI contends the trial court erred in failing to grant its motion for new trial and/or rehearing of the prior judgment rendered in favor of Underwriters granting Underwriters' motion for summary judgment and dismissing AI's claim for bad faith damages. AI further contends *1068 the trial court erred in failing to award damages for the loss occasioned to the building's roof.
Underwriters filed a cross appeal wherein it contends the trial court erred in finding that AI presented sufficient evidence to prove its claim for damages to its inventory.
LAW AND DISCUSSION
Standard of Review
In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error - clearly wrong standard, which precludes the setting aside of a trial court's finding of act unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n , 02-2660 (La. 6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Hall v. Folger Coffee Co. , 03-1734 (La. 4/14/04), 874 So.2d 90, 98. Rather, in reversing a trial court's factual findings, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Stobart v. State through Dept. of Transp. and Development , 617 So.2d 880, 882 (La. 1993).
This test requires the reviewing court to do more than simply review the record for some evidence that supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Parish Nat. Bank v. Ott , 02-1562 (La. 2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's fact-finding conclusion was a reasonable one. Rosell v. ESCO , 549 So.2d 880, 884 (La. 1989) ; Canter v. Koehring Co. , 283 So.2d 716, 724 (La. 1973).
Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Varmall v. Bankers Specialty Ins. Co. , 15-223 (La. App. 5 Cir. 10/28/15), 178 So.3d 181, 183-84citing Waguespack v. Sentry Select Ins. Co. , 12-280 (La. App. 5 Cir. 11/13/12), 105 So.3d 880, 884-85, writ denied , 12-2700 (La. 2/8/13), 108 So.3d 90. Moreover, where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Id. , 178 So.3d at 184. It is only where the objective evidence so contradicts a witness' testimony, or the testimony itself if so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it, that the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. Id.
When an appellate court finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to re-determine the facts de novo from the entire record and render a judgment on the merits. Ferrell v. Fireman's Fund Ins. Co. , 94-1252 (La. 2/20/95), 650 So.2d 742, 745. While great deference should be accorded to the fact finder, appellate courts have a constitutional duty to review facts, and to perform its constitutional duty properly. Thus, appellate courts must determine whether the lower court's conclusions were clearly wrong based on the evidence or are clearly without evidentiary support.
*1069 Stewart v. State ex rel Dep't of Transp. & Dev. , 08-0772 (La. App. 1 Cir. 3/20/09), 9 So.3d 957, 963, writ denied , 09-1228 (La. 9/18/09), 17 So.3d 968.
With these legal precepts in mind, we turn to the issues presented herein for our review.
Misrepresentation of the Policy Provisions
Prior to trial, the trial court granted Underwriters' motion for summary judgment dismissing AI's claim for bad faith damages. Thereafter, AI filed a motion for new trial and/or rehearing, which motion the trial court considered and denied in open court on the morning of trial.[6] On appeal, AI contends the trial court manifestly erred in granting Underwriters' summary judgment motion, and in denying its motion for new trial, despite clear evidence that Underwriters misrepresented the Policy's deductible. We disagree.
Appellate courts review summary judgments de novo using the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Jones v. ABC Ins. Co. , 17-368 (La. App. 5 Cir. 5/30/18), 249 So.3d 310, 315. The decision as to the propriety of a grant of a motion for summary judgment must be made with reference to the substantive law applicable to the case. Ricalde v. Evonik Stockhausen, LLC , 16-178 (La. App. 5 Cir. 9/22/16), 202 So.3d 548, 551-52, writ denied , 16-1923 (La. 12/16/16), 212 So.3d 1170. To prevail on a claim for bad faith claims adjusting under La. R.S. 22:1892 and La. R.S. 1973,[7] a plaintiff bears the burden of proving: (1) the insured provided a proof of loss; (2) the proof of loss was satisfactory; that is, sufficient information to allow the adjuster to pay the undisputed amount within 30 days; and (4) the insurer's failure to timely make payment of the undisputed amount was the result of conduct that was arbitrary, capricious and/or without probable cause. La. R.S. 1892(B)(1). An insurer's actions are "arbitrary and capricious" when its willful refusal of a claim is not based on a good faith defense, or is unreasonable or without probable cause. Calogero v. Safeway Ins. Co. of Louisiana , 99-1625 (La. 1/19/00), 753 So.2d 170, 173.
In the case sub judice , although AI posits that "[Underwriters] ... acted arbitrarily and capricious and without probable cause in failing to pay [its] claim," AI does not set forth any facts upon which it relies to support this contention, nor does it direct this Court to any testimony or exhibits in the record to substantiate its bald allegation. Our de novo review of the record convinces us that the trial court properly dismissed AI's claim that Underwriters acted in bad faith or was "arbitrary and capricious" in its handling of AI's insurance claim.
AI also contends that Underwriters' breached its duty of good faith and fair dealing when its adjuster, Mr. Dossett, misrepresented the Policy's deductible. In particular, AI contends that "[m]isrepresenting the deductible is a breach of the *1070 insurer's duty set forth in La. R.S. 22:1973(A) [,]" which provides:
An insurer, including but limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
The Policy Underwriters issued to AI provided for building coverage with limits of $300,000.00, coverage for personal property with limits of $200,000, and contained a 3% wind and hail deductible. Applying the 3% deductible in accordance with the Policy's terms, the deductible for building coverage was $9,000.00, and the deductible for personal property coverage was $6,000.00; thus, the Policy's deductible totaled $15,000.00. In correspondence from Underwriters' adjuster, Mr. Dossett, to Mr. Zughayer dated September 28, 2012, Mr. Dossett stated that the Policy carried "a 3% Wind and Hail deductible of $15,000.00" and that he could not "see where the loss would exceed the deductible." According to AI, Mr. Dossett's reference to a total deductible of $15,000.00-rather than separately identifying a $9,000.00 deductible for losses to the building, and a $6,000.00 deductible for damage to personal property-constituted a material representation of the Policy's provisions and a breach of Underwriters' duty of good faith and fair dealing such that Underwriters is responsible to it in damages.
The record, however, belies AI's contention. Specifically, Mr. Zughayer confirmed in his testimony at trial that there was no misunderstanding regarding the Policy's deductible in this case. Further, even if there was some misunderstanding regarding the deductible-of which we have found no evidence in our de novo review of the record-AI has presented no evidence or testimony establishing that it was damaged in any way as a result of this alleged misrepresentation. Accordingly, based upon our de novo review of the record, we find no merit to AI's contention that the trial court erred by dismissing its claim for bad faith damages or by denying its motion for new trial and/or rehearing on this issue.
Building Damages
In its next assignment of error, AI contends the trial court's failure to award roof damages was manifestly erroneous because: (1) the uncontroverted documentary evidence showed hurricane-related damage to the roof; (2) the testimony of Mr. Zughayer and Billy Burr established that AI paid $22,000.00 to repair the roof; and (3) the trial court found coverage under the Policy for AI's loss of its water-damaged tobacco inventory, which was stored in the attic directly beneath the alleged leaking roof.[8] The trial court found the evidence presented by AI to be "contradictory, inconsistent, ... unsupported" and insufficient to prove his building damage claim. We agree.
AI argues that the uncontroverted testimony at trial established that at the time of Hurricane Isaac, the building and its *1071 roof were just over a year old and that there had been no prior issues with leaks. According to Mr. Zughayer, the roof first began leaking immediately after the hurricane, which is what prompted him to file the claim with Underwriters. In particular, Mr. Zughayer testified that he observed water coming from the hood vent in the kitchen. He stated the water was streaming down the walls and dampening the ceiling tiles. AI introduced numerous photographs into evidence at trial that were taken of the inside of the convenience store by Mr. Zughayer depicting what he alleged to be water damage caused by the leaking roof. Notably, of the 82 photographs offered into evidence, not one photograph was taken of the purported damage to the roof.
In order to address the roof damage, Mr. Zughayer testified that he contacted A-1 Steel Erectors ("A-1"), the company that installed the roof at the time of the building's original construction, to obtain an estimate for repairs to the roof. He stated that A-1 submitted an estimate in the amount of $32,842.00 to repair the damage to the roof "due to storm damage." Though A-1's estimate was submitted to Mr. Zughayer on September 28, 2012-only twenty days after Mr. Dossett had inspected the building on behalf of Underwriters-this estimate was never provided to Underwriters (nor was any other estimate of purported damage to the building or its contents).
Rather than have A-1 actually perform the roof repairs, Mr. Zughayer testified that he retained the services of one of A-1's subcontractors, Bobby Burr, to perform the job for $28,200.00. He stated that he presented Mr. Burr with a check for that amount-a check that was never cashed and was made payable to "LA 1 Roofing" not "Bobby Burr"-but explained that Mr. Burr returned the check to him after they agreed to a cash price of $22,000.00, which he claimed he paid to Mr. Burr after the repairs were completed. Mr. Zughayer had no receipts, invoices or other documentary evidence to show that the repairs to the roof were actually made, or to prove that he ever paid cash to Mr. Burr for having performed the work.
Mr. Burr testified that he provided Mr. Zughayer with an estimated cost to complete the roof repairs of $27,000.00, but that they later negotiated a cash price of $22,000.00 for the job. Mr. Burr also gave a detailed account of the specific repairs he recalled making to the roof that was "leaking [b]adly in several places," to the extent that a total replacement of the one-year old roof was required. He testified that it took him, and a crew of "four-to-five guys," ten to twelve days to complete the work. While Mr. Burr stated that Mr. Zughayer paid him $22,000.00 in cash, and that he paid his crew in cash for their work, he claimed that he had not one record to substantiate either the cash he received or the cash he paid. He also had no records to corroborate his testimony that he actually replaced the entire roof, such as the estimate, a permit, or invoices for the materials he purchased.[9] Further, when presented at trial with a check made payable to "LA 1 Roofing" in the amount of $28,200.00-a check Mr. Zughayer claimed to have given Mr. Burr to perform the roof repairs, and Mr. Burr had previously attested to having received from Mr. Zughayer but never cashed[10] -Mr.
*1072 Burr denied that Mr. Zughayer had ever presented him with this check or any other check for the roofing job.[11] Incredibly, Mr. Burr testified at one point that he had completely forgotten about ever having performed the repairs, but then later testified that he not only remembered exactly what items he used to do the repairs, he also knew the exact costs of those items. And still later, Mr. Burr testified that he often had difficulty with his memory.
According to AI, despite the absence of demonstrative evidence, the corroborating testimony of Mr. Zughayer and Mr. Burr is sufficient to prove that the roofing repairs were completed and the amount that was paid, as both witnesses testified that Mr. Burr received $22,000.00 in cash after he finished the job. AI also argues that Underwriters' adjuster, Mr. Dossett, did not dispute that the roof was damaged, but he wrongfully concluded that the damages were not hurricane related. In this regard, AI avers that Mr. Dossett performed an inadequate inspection of the premises. In particular, AI claims that when Mr. Dossett arrived to conduct the inspection, he did so without a ladder, which prevented him from climbing onto the roof to properly and fairly assess any damages. Additionally, contrary to Mr. Dossett's testimony that he gained access and viewed inside of the building's attic using the flash on his camera, Mr. Zughayer denied Mr. Dossett ever entered or observed the inside of the attic as it was impossible to do so without the use of a ladder, which Mr. Dossett admitted he did not have.
Mr. Dossett testified that after arriving at Mike's Food Mart and inspecting the outside of the building for hurricane-related damages, he proceeded inside the building and met with Mr. Zughayer. He claimed that his initial impression was that the building was in good condition, operational, and well stocked. Because he detected no obvious physical damage, he had Mr. Zughayer take him to the two areas of the store where Mr. Zughayer claimed the roof had been damaged and was leaking. The first area was near a walk-in cooler, where Mr. Dossett testified that he observed an opening that looked to him to be a "crawl space" in-between the cooler and the back wall. He stated that he climbed atop the cooler looking for water and saw none. He did observe a pre-existing roof penetration where the Freon line entered the ceiling from the remote cooling unit on top of the roof and where rain water could have entered the building. According to Mr. Dossett, he could see outside through an opening around the Freon line where it penetrated the ceiling from the roof. This open space indicated to him that the area was not properly caulked or sealed and possibly allowed water to enter the building. Mr. Dossett testified that he took a couple of photographs of the area near the walk-in cooler, but other than a bit of moisture around the cooling line that was laying on the floor behind it, he did not see any damage for him to record.
Next, Mr. Dossett inspected the ceiling around the hood vent located in the kitchen *1073 area where Mr. Zughayer claimed water had been leaking due to damage from the roof. While Mr. Dossett observed some missing ceiling tiles and tiles that were discolored and possibly damp, he testified that he did not see any damage in or around the hood itself and did not see any evidence of water leaking through the roof. Based upon his knowledge of kitchen hood ventilation systems, Mr. Dossett attributed the damp tiles to the poor quality of installation of the hood system coupled with the building's flat roof. Specifically, he explained that if excessive rain water were to accumulate on the flat roof, it would eventually seep into the ceiling tiles through any gaps or holes existing around the hood system where its vents penetrated the roof that were not properly caulked or sealed. Considering what he observed, Mr. Dosssett testified that there was no physical damage that he could see that would lead him to believe that the water damage near the walk-in cooler or around the hood vent was caused by wind or water from Hurricane Isaac.
In Louisiana, a plaintiff bears the burden of proving with legal certainty every item of damages, and the plaintiff's own uncorroborated testimony is insufficient to satisfy that burden. Blake v. City of Port Allen , 14-0528 (La. App. 1 Cir. 11/20/14), 167 So.3d 781, 792. If the damaged property has been restored to its former condition by repair, the proper basis for assessing damages is the repair bill itself. Magee v. Ranger Ins. Co. , 276 So.2d 879, 881 (La. App. 1st Cir. 1973). In concluding that AI failed to meet its burden of proving damages to the building, including the roof, the trial judge provided the following written reasons:
[Mr. Zughayer] agreed that he considered himself to be a sophisticated businessman. One would be inclined to agree, considering he owns several businesses. Consequently, his alleged 'record keeping' methods make absolutely no sense. It would have been much simpler to just get a receipt. He had had prior dealings with all of the contractors and had apparently paid them in cash before.... There is no reason [Mr. Zughayer] could not have asked for a receipt just as he has done in the past. Considering the contradictory, inconsistent, and unsupported evidence presented by [AI], this Court finds that [it] has failed to introduce evidence sufficient to prove his building damage claim.
As the trial judge determined, and our review of the record confirms, AI failed to produce a single receipt for the repairs to the roof. Moreover, we find the conflicting, inconsistent, and unsupported testimony of Mr. Zughayer and Mr. Burr was inadequate to corroborate the costs of the repairs. The only documentary evidence AI presented associated with roof repairs was the estimate prepared by A-1 Steel Erectors, who did not perform the work. And though Mr. Burr claimed that he provided Mr. Zughayer with an estimate of $27,000.00 to complete the work, neither Mr. Zughayer nor Mr. Burr retained a copy of that estimate. Further, the check Mr. Zughayer claims to have given to Mr. Burr as evidence that roof repairs were made-which check Mr. Burr remembered having received prior to trial but then, at trial, denied ever having even seen it-was made payable to someone other than Mr. Burr and was made out for $28,200.00, not the estimated $27,000.00. The only consistency in the testimony of Mr. Zughayer and Mr. Burr was that Mr. Burr was paid $22,000.00 in cash for the job, yet neither could produce a single receipt, bank statement or deposit slip as proof that the cash payment was either made or received.
Additionally, while AI presented over 80 photographs of purported damage to the *1074 building, not one depicts damage to the roof or repairs being made to the roof. In short, the record is devoid of any demonstrative evidence to corroborate the conflicting, and largely incredible, testimony of Mr. Zughayer and Mr. Burr, and contains no evidence to substantiate AI's claim that the roof was either damaged or repaired as a result of Hurricane Isaac.
Though AI has abandoned on appeal several of the other claims it made in the lower court for damages to the building, we mention those claims here solely in order to illustrate that our review of the record in its entirety leads us to conclude that the testimony and evidence presented by AI during the course of this litigation was repeatedly unreliable, internally inconsistent, and incredible. For example, prior to trial, in its opposition to a motion for summary judgment filed by Underwriters, AI presented several checks to the trial court claiming that they proved what AI had paid to make the necessary repairs to the storm-damaged property. The checks (similar to the one AI claimed to have been given to Mr. Burr) were made payable to entities that AI had not previously identified in discovery responses, and were for amounts that differed from those that Mr. Zughayer later testified were actually paid to the contractors to complete the purported repairs. When Underwriters subsequently sought to subpoena AI's (or Mr. Zughayer's) bank records, those checks that AI claimed to have been paid did not appear. Nor did the bank's records reveal cash withdrawals matching the amounts indicated on the checks. Moreover, in response to subpoenas issued by Underwriters to the different contractors named on the checks, not one had any documentation showing that they had performed any repair work for AI or that they had ever received or deposited a check from AI or Mr. Zughayer. When confronted with these inconsistencies at trial, Mr. Zughayer explained that the checks to these contractors were written solely for his record-keeping purposes and were never intended to be negotiated; cash payments were substituted for the checks and hand-delivered to the contractors. Unbelievably, neither Mr. Zughayer nor any of the contractors had documentation evidencing that the repairs were actually performed or that the cash payments were ever made. In fact, the documentation submitted by the contractors in response to Underwriters' subpoenas indicated to the contrary-that the work was not performed and that the cash was never paid.
Specifically, Carla Bushnell, a representative of IRC Services, Inc., who was purportedly paid $8,150.00 to repair storm-related damages, testified that on September 4, 2012, IRC prepared a "quote" for $23,881.50 to complete work on the gas pumps at Mike's Food Mart. IRC's business records, however, which showed every deposit made during the applicable time period, indicated that no check from AI or Mr. Zughayer had been deposited. Additionally, the records reflected that no cash payment had been deposited by IRC. Further, Ms. Bushnell testified that she was unable to locate an invoice or receipt for Mike's Food Mart, which would have suggested that the proposed work had been done and payment received. According to Ms. Bushnell, this indicated to her that not only had the work outlined in the September 4, 2012 "quote" never been performed, no payment had ever been received.
Tuyen Huynh was called to testify regarding work performed on the air conditioning/refrigeration at Mike's Food Mart following the hurricane. Mr. Huynh testified that he went to Mike's Food Mart to inspect the duct work that Mr. Zughayer claimed had been damaged in the storm. After doing so, he advised Mr. Zughayer *1075 that everything looked "fine" with the duct work. He stated that Mr. Zughayer then asked him to go onto the roof to check the air conditioning unit, which he did and found it to be working fine. Interestingly, according to Mr. Huynh, Mr. Zughayer went up onto the roof with him as he inspected the air conditioning unit. Mr. Huynh claimed that Mr. Zughayer then asked him to prepare a damage estimate to repair all of the duct work so that it could be presented to the insurance company for reimbursement. He stated that Mr. Zughayer told him exactly what to write on the estimate, including that "[d]ue to Hurricane Isaac, the roof was damaged and caused water to leak ... into the supply and air return ducts[,]" even though he observed no damage to the roof or water in the ducts. According to Mr. Huynh, at the direction and in the words of Mr. Zughayer, he prepared a proposal "for replacement of a duct that had water leaked into it" in the amount of $1,547.00 Mr. Huynh testified that Mr. Zughayer contacted him on more than one occasion asking him to prepare a fraudulent receipt to show that the duct work had been done and that he could "name [his] price." However, according to Mr. Huynh, no work was ever performed because no work needed to be performed. Additionally, when presented at trial with Mr. Zughayer's check made payable to "Van's AC" for $9,200.00, Mr. Huynh testified that he had never seen the check nor had he made any cash deposit for monies he (or his father, who also performed air conditioning work at Mike's Food Mart and originally installed its air conditioning unit) received from Mr. Zughayer.
Given AI's presentation of its case in the trial court-which the lower court found to be "contradictory [and] inconsistent"-coupled with the total absence of documentary evidence to substantiate the damages AI alleged were sustained to the building's canopies, gas pumps, and air conditioning units, it is understandable why the trial court rejected all of AI's claims to the building (including the roof), and why AI has now abandoned those claims on appeal. Accordingly, we find no error in the trial court's determination that AI failed to present sufficient credible evidence to prove his claim for damages to the building's roof. This assignment of error is without merit.
Loss of Inventory
Underwriters filed a cross appeal in this matter averring the trial court manifestly erred in awarding $26,654.10 in damages to AI for the loss of its tobacco inventory, not only because AI presented insufficient evidence to prove this loss, but because this finding is inconsistent with the trial court's ruling denying AI's building damage claim. Specifically, the trial court determined that AI satisfied its burden of proving at trial that its tobacco inventory was damaged and that the damage was "caused by water intrusion from the rain and winds of Isaac." Interestingly, however, both Underwriters and AI agree that this factual finding-that the alleged damage to AI's tobacco was hurricane related-is inconsistent and irreconcilable with the trial court's finding that the roof, under which the inventory of tobacco was purportedly stored, was not damaged as a result of the hurricane. We, too, agree that these factual findings are irreconcilable. Thus, having already affirmed the trial court's ruling rejecting AI's claim for damages to the building's roof due to a lack of sufficient credible evidence, and finding on the record that AI's evidence regarding its tobacco inventory loss was riddled with conflicting, inconsistent and unsupported evidence that was insufficient to prove that the alleged damage was in any way related to Hurricane Isaac, we resolve the inconsistency in favor of Underwriters. Consequently, *1076 we reverse that portion of the trial court's judgment awarding $26,654.10 to AI for loss of its tobacco inventory.
According to Underwriters, prior to trial, AI failed to identify the hurricane-damaged inventory and to quantify what was purportedly paid to replace it. Mr. Zughayer admitted at trial that during the five years this claim had been pending, he had never once provided Underwriters with an itemization of his alleged damaged inventory and had never once mentioned that tobacco was damaged: not in AI's petition; not in response to discovery; not in his deposition; not in two separate affidavits he had previously executed in this case; and not in the 82 photographs he took in the days following the hurricane.
At trial, for the first time since making the claim , Mr. Zughayer identified the particular items he claimed sustained hurricane damage, including tobacco that was placed on top of the cashier's counter and tobacco that he stored in the attic. Mr. Zughayer also identified several items kept in the storage room that he claimed were damaged, including "kitchen items, like the bulks or rice, sugar, flours (sic), mashed potatoes ... cleaning powder[.]" However, other than its tobacco damage claim, the trial court denied AI's claims for the remaining damaged items finding AI failed to produce any documentary evidence to substantiate those alleged losses. On appeal, just as AI completely abandoned its claims for damage to the building's signs, fuel pumps, and canopies due to the lack of credible testimony and documentary evidence to support them, AI likewise abandoned its inventory loss claims, except for its tobacco loss.
To prove its claim for loss of its tobacco inventory, AI relied on the following: the testimony of Mr. Zughayer; a receipt for the payment of two invoices for tobacco orders placed by Mr. Zughayer on September 3, 2012 and September 8, 2012; and, the testimony of Ms. Lakeisha Jones, an employee of Mike's Food Mart. Though Mr. Zughayer had five years to identify, itemize, and quantify the tobacco inventory in the store's attic that he claimed was hurricane damaged, his testimony at trial was Underwriters' first notice of this particular loss:
Q. I want the record to be clear that on August 29, 2017, you provided to us copies of vendor receipts from June 2012 through December 2012, correct?
A. Correct.
Q. And today we got the first itemization of any inventory that was damaged, correct?
A. Correct.
Q. And that was this tobacco that you outlined, correct?
A. Not only tobacco. I mentioned other things besides tobacco.
Q. But you never itemized, you never told us that that amount was, correct?
A. The question that you had asked me today, that I had told you guys about items was damaged, correct? You just asked me that question. What, I told you for first time, I told you what been (sic) damaged, correct?
Q. Yes.
* * * *
Q. So you itemized the tobacco for us today.
A. When - -
Q. And then you just explained these other items for us today.
A. Correct.
Q. And but before this, we had never received this kind of explanation from you in the discovery responses *1077 or in your deposition. Today was the first day we got this kind of explanation.
A. Correct.
Mr. Zughayer testified that on September 3, 2012, he placed an order with IWC, International Wholesale Club, for 847 cigarette cartons, 12 smokeless tobacco, and three convenience items (batteries). According to Mr. Zughayer, this order was made to replace the tobacco that was damaged in the hurricane.[12] He explained that a second order with IWC was made on September 8, 2012 for the replacement of damaged tobacco. To corroborate his testimony, Mr. Zughayer produced a receipt from IWC, International Wholesale Club dated September 2012 reflecting payment for the purchase of $32,654.10 in cigarettes. Mr. Zughayer testified that this was the cost he incurred to replace the hurricane-damaged tobacco that was stored in the attic located directly below the damaged roof he claimed was leaking.[13] AI averred the invoices and receipt established that the tobacco in the attic was damaged and what Mr. Zughayer paid to replace it.
To the contrary, we find these invoices and receipt actually contradict Mr. Zughayer's contention that the orders for tobacco placed on September 3, 2012 and September 8, 2012, were made to replace tobacco damaged as a result of Hurricane Isaac. It is undisputed that Underwriters' adjuster, Mr. Dossett, conducted his inspection of AI's premises on September 8, 2012-only five days after the first order for tobacco was placed and the same day the second order was made-an ordered that totaled $32,110.10. Mr. Dossett testified that he specifically asked Mr. Zughayer on September 8, 2012 to identify and show him the personal property or contents in the store that sustained hurricane damage. Not only did Mr. Zughayer fail to show Mr. Dossett damaged tobacco that day, Mr. Zughayer failed to even mention water damage to his tobacco inventory. It belies all logic and is, in fact, incredible, that having placed a substantial order that same day to replace inventory he was claiming to be damaged, and at a significant cost for which he was requesting repayment, that when asked to specify the damaged items, he would fail to even mention the loss of that expensive item. Then, when provided with the Contents Loss Claim Sheet with instructions to complete it, despite having access to the documentation that would verify his claim, Mr. Zughayer again failed to produce the information concerning this alleged substantial loss. Further, when specifically asked on more than one occasion in discovery to provide a description and to quantify any damaged inventory and the cost to replace it, Mr. Zughayer's failure to produce this information and documentation makes no sense. Even more troubling is that when asked in his deposition to again provide this information, Mr. Zughayer, a seasoned businessman, failed to produce the evidence he obviously had in his possession that would substantiate the loss of his most expensive inventory. The only logical conclusion reasonable minds could reach is that the receipt for payment of those two invoices was not payment to replace damaged tobacco, but rather, was a payment to restock the store's inventory of tobacco *1078 (and the other items contained on the invoice) as part of a regular or routine order.
Further, Ms. Jones' testimony does not corroborate (or refute) Mr. Zughayer's testimony that there was hurricane-damaged tobacco in the attic. While Ms. Jones testified she had assisted others in moving items delivered to the store to the attic for storage, she did not testify that she had observed anyone place tobacco into the attic following the hurricane. In fact, though Ms. Jones stated that she had assisted Mr. Zughayer in cleaning up the store following the hurricane by removing all of the damaged goods and helping to restock the shelves, nowhere in her testimony did she even mention cleaning out wet tobacco. Ms. Jones did not mention tobacco at all.
In the days immediately following the hurricane, Mr. Zughayer took over 80 photographs of the premises, including photographs of the areas around the store and building that he claimed were damaged in the storm. Also included were photographs of spoiled produce, food and drinks. There is not one photograph showing damaged or wet tobacco. At trial, Mr. Zughayer testified that the tobacco inventory was stored in two places: on top of the cashier's counter and in the attic. While there are photographs of undisturbed and undamaged shelves containing cartons and packs of cigarettes near the cashier's counter, there are no photographs of damaged tobacco. Not a single missing or stained ceiling tile near the shelved tobacco is seen in the photographs. There are also no photographs of the attic or damaged tobacco in the attic.
AI did not call one witness to corroborate Mr. Zughayer's claim of damage to the tobacco inventory. Other than his own self-serving, conflicting and implausible testimony, the only evidence presented to the trial court to prove his claim for damaged tobacco, was the lone receipt with absolutely no context. Even when reviewing the record in a light most favorable to AI, we find the evidence and testimony of Mr. Zughayer implausible on its face and that a reasonable fact finder would not credit it. Moreover, based upon our review of the entirety of the evidence and testimony in the record, we are unable to reconcile the trial court's factual finding on the one hand-that the building's roof was not damaged because AI's evidence was "contradictory, inconsistent, and unsupported"-with the trial court's factual finding on the other-that AI's evidence was sufficient to satisfy its burden of proving that it replaced tobacco that was damaged "by water intrusion from the rain and winds of Isaac." Thus, we hold the trial court's factual finding that AI's "evidence of damages to [its] inventory to be sufficient to satisfy [its] evidentiary burden of preponderance of the evidence" was manifestly erroneous and clearly wrong and requires reversal of the $26,654.10 in damages awarded to AI for its loss of inventory claim.
CONCLUSION
For the foregoing reasons, we affirm the trial court's judgment granting Underwriters' motion for summary judgment dismissing AI's claim for bad faith damages. Further, we affirm the trial court's denial of AI's motion for new trial and/or rehearing on that issue. We also affirm that portion of the trial court's judgment denying AI's claim for building damages, and reverse that portion of the trial court's judgment awarding AI damages for loss of personal property.
AFFIRMED IN PART; REVERSED IN PART.

The construction of Mike's Food Mart was completed in 2011, approximately one year prior to Hurricane Isaac, and consists of a convenience store with gas pumps and a covered awning. Located inside the convenience store is a kitchen with a commercial hood ventilation system.

The Policy also contained a $1,000.00 deductible for all other perils. The Policy specifically excluded coverage for losses occasioned as a result of a flood, and excluded any damages resulting from any "hidden defect or quality in property that causes it damage." Moreover, any damage due to a power outage was excluded under the Policy.

At trial, Mr. Dossett testified that during his inspection of the premises, he did not observe any damage to the contents, and other than spoiled food items and drinks, Mr. Zughayer did not point out any damaged contents to him.

The deductible for building loss was $9,000.00 (3% of the $300,000.00 limit), and the deductible for personal property loss was $6,000.00 (3% of the $200,000.00), for a total hurricane deductible of $15,000.00.

On the morning of trial, prior to its commencement, the court orally denied AI's motion for new trial and/or rehearing of the court's previous grant of summary judgment in favor of Underwriters dismissing AI's claim that Underwriters acted in bad faith or was arbitrary and/or capricious when it misrepresented the Policy's hurricane deductible.

The denial of AI's motion for new trial and/or rehearing was never reduced to a written judgment.

La. R.S. 22:1892 requires an insurer to "pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest." See La. R.S. 22:1892. But even when an insurer fails to make a timely payment within the terms of Section 22:1892, "such failure [must be] found to be arbitrary, capricious, or without probable cause" before an insurer will be subjected to a penalty. Id. La. R.S. 22:1973 places duties on property insurers "to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both" within "sixty days after satisfactory proofs of loss." See La. R.S. 22:1973.

At trial, Mr. Zughayer presented evidence regarding damages to the building that he claimed were sustained in Hurricane Isaac, which included purported damage to exterior signs, fuel pumps, the air conditioning/refrigeration unit, and to the roof. The trial court ruled that the evidence was insufficient to prove any of these alleged damages to the building. On appeal, AI has abandoned all building damage claims except for damages to the building's roof.

Mr. Burr explained that he does not keep any business records for more than three years.

In an affidavit dated July 12, 2017, which was attached to AI's opposition to Underwriters' motion for summary judgment, Mr. Burr attested to the following, in pertinent part: "[A]ffiant was given Zegar, Inc. check # 3002, drawn on Chase Bank payable to 'LA 1 Roofing' in the amount of $28,200.00 ... [which] represents payment for repairs to the roof at or upon Mike's Food Mart ... necessitated by Hurricane Isaac."

No explanation was ever given as to why the check was made payable to LA 1 Roofing, a party that never appeared at trial, when A-1 Steel Erectors, a completely different company, had prepared the estimate, and Bobby Burr claimed to have completed the repairs. Also, there was no explanation provided as to why the check was made out for $28,200.00, when A-1's estimate was for $32,842.00 and Mr. Burr claimed to have provided Mr. Zughayer with an estimate totaling $27,000.00.

Mr. Zughayer conceded that the batteries and the 12 smokeless tobacco items listed on the invoice were not damaged, and he clarified that these items were not part of his claim, and that he was not seeking the cost for replacing these items.

A copy of the invoices and receipt, though properly admitted into evidence at trial, are not contained in the record on appeal.