MOLAISON, J.
*1052 Warren G. Treme ("Treme"), a building contractor and former customer of First Bank and Trust ("First Bank"), appeals a judgment dismissing his claims for damages against the bank and its subsidiary, First Bank and Trust Community Development Corporation ("First Bank CDC"), under the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972 et seq. (the "anti-tying claims"), with prejudice after a jury trial. Treme asserted these claims in response to the bank's lawsuit against him for sums due on promissory notes. The bank's claims were resolved by a consent judgment and are not at issue in this appeal.
At the trial of his anti-tying claims, Treme maintained that the bank violated federal law by requiring him to continue providing construction services to First Bank CDC on community development projects as a condition or requirement for obtaining loans from the bank.[1] The jury found the evidence insufficient to prove that a tying arrangement existed. The trial court dismissed Treme's claims with prejudice based on the jury verdict.
On appeal, Treme seeks to have the judgment of dismissal reversed. He claims the trial court committed reversible error in its instructions to the jury and contends the jury was clearly wrong in finding that no tying arrangement existed. For the reasons that follow, we affirm.
PROCEDURAL HISTORY
This lawsuit originated in 2006 with First Bank's collection efforts against Treme by executory process and a petition for a deficiency judgment. Treme answered the petition and filed a reconventional demand against the bank and third party demands against First Bank CDC and Joseph C. Canizaro, the bank's chairman, asserting claims for breach of contract, fraud, fraudulent inducement, illegal tying, extortionate banking transactions, and breach of fiduciary duty. Canizaro was dismissed from the lawsuit by summary judgment, which this Court affirmed in First Bank and Trust v. Treme, 13-168 (La. App. 5 Cir. 10/30/13), 129 So.3d 605.
In a 2009 judgment on exceptions, the trial court sustained an exception of prescription as to some of Treme's illegal tying claims, which involved bank loans and construction contracts spanning the period 1996-2005. Noting that anti-tying claims must be brought within four years of when the alleged violation occurred, the trial court found that claims arising from *1053 contracts executed before July 28, 2002, were prescribed. 12 U.S.C. § 1277.
In August 2017, First Bank and Treme entered into a consent judgment in the bank's favor for over $2 million in principal, interest and attorney fees owed by Treme on promissory notes. The consent judgment recognized Treme's right to offset this indebtedness by any amount that may be awarded to him on his demands against First Bank and First Bank CDC.
By the time of the jury trial in 2017, Treme's only remaining claims against First Bank and First Bank CDC were the anti-tying claims. At trial, Treme limited his damage claims to contracts executed after July 28, 2002, in accordance with the trial court's ruling on the prescription exception. However, the court allowed the parties to introduce evidence of contracts executed before that date to provide a complete narrative to the jury about the relationships between the parties, which began with the earlier contracts, and to provide context for references to the earlier contracts in the evidence concerning non-prescribed claims.[2]
ANTI-TYING LAW
Treme's claims against First Bank and its subsidiary, First Bank CDC, are founded on the following provisions in the Bank Holding Company Act, 12 U.S.C. § 1972(1)(C) and (1)(D) :
(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement-
(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service; [or]
(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company[.]
The trial court instructed the jury that the plaintiff in an anti-tying claim must prove three things: (1) that the bank extended credit or made a loan to a borrower with a requirement or condition that the borrower obtain or provide some service to the bank or its subsidiary; (2) that the arrangement is considered unusual; and (3) that the bank received a benefit from the arrangement.
Without objection, the jury was instructed as follows:
A claim made under the Bank Holding Company Act requires proof that the extension of credit was conditioned on the bank's customer obtaining some other product or service from the bank or one of its subsidiaries. The term "conditioned" or "required" means that something was demanded or required as a prerequisite to the loan. What is required here is proof that the bank conveyed its intention to withhold credit unless the borrower fulfilled a prerequisite of purchasing or furnishing some additional product or service other than repayment of the loan. Further, that additional product or service must be shown to be a tying arrangement which actually benefited the bank.
During its deliberations, the jury used a verdict form with questions concerning each element of proof in the case. By a vote of 9-3, the jury answered "No" to the first question: "Do you find by a preponderance of the evidence that a tying arrangement(s)
*1054 existed between Warren G. Treme and First Bank and Trust?" The jury did not answer the other questions in the verdict form.
FACTUAL BACKGROUND
First Bank CDC, a wholly owned subsidiary of First Bank and Trust, coordinated community development projects involving blighted homes in New Orleans by assisting property owners with hiring architects and contractors and obtaining financing to renovate their property. During the construction phase, funding came primarily from sales of tax credits to investors and from community development block grants. Once the renovations were completed, the owner could obtain a bank loan. The community development work of First Bank CDC was important to its parent company, First Bank, because federal law requires banks to do a certain amount of business in challenging areas.
Treme, a self-employed general contractor, began working on First Bank CDC projects in the late 1990s and entered into more than a dozen construction contracts involving First Bank CDC projects from 1996 until 2003. Initially, the properties were owned by various nonprofit organizations, with First Bank CDC serving as the developer. First Bank CDC was a for-profit organization and charged development fees on the projects. On three of the later projects, First Bank CDC was the property owner.
A fixed-price construction contract was signed for each project, meaning that Treme could not get paid any more than the stated contract price unless the property owner approved a change order for an additional payment. Whether serving as owner or as developer, First Bank CDC calculated the price to be paid to the contractor by considering the amount of financing that was available for a particular project, primarily from tax credits and grants, and did not solicit bids from contractors to determine what the proposed work would cost. The contract prices in Treme's contracts ranged from $47,000 to $1.2 million, depending on the number of properties involved in a project.
Treme was paid the full contract price on each contract but claimed that he lost money on every project he did for First Bank CDC because the contract price was never enough to cover the construction costs. He testified that all of the money he borrowed from First Bank was used to pay for cost overruns on First Bank CDC projects, but he did not produce any documents to substantiate that cost overruns occurred or the amount of any overruns. He acknowledged that his accounting was not what it should be and said all of his business and personal records were destroyed in Hurricane Katrina.
On direct examination, Treme identified several loan documents he signed from 2003-2005 and testified:
Q. So as late as March 2005, you were still getting extensions of credit at the bank and you were still working on bank, CDC property?
A. Yes.
...
Q. You understood that they are not going to give you this credit unless you keep working on the projects?
A. Yes.
...
Q. Did you understand that you had told the bank that they could get any profit - any profit would go to them to pay these notes, if they needed that?
A. Yes.
Treme testified that his relationship with First Bank CDC began when a loan officer at First Bank asked him to be part of a team the bank was putting together to *1055 revitalize inner city neighborhoods. Throughout his testimony, Treme said he considered himself to be part of the team. When asked why he continued working on unprofitable projects, Treme said the bank's owner, Joseph Canizaro, and its president, David Moore, told him to "keep going" on the projects, which they said were important to them, and assured him that the bank would cover the losses and that he would make money on future projects.
Treme testified that he did not read any of the construction contracts or loan documents he signed. He did not consult a lawyer about the contracts before he signed them, explaining that he signed some of the contracts in meetings he attended with bankers, architects, First Bank CDC representatives and lawyers present. Treme said he assumed the lawyers represented everyone on the team, including him.
When asked why he continued to sign the contracts, Treme said:
A. I was part of a team of these people. Whatever they told me to sign, I just signed. I wasn't paying attention to all of this stuff. I wanted to get into the bigger picture of these with Mr. Canizaro and Mr. David Moore and all these people that promised me.
...
Q. Why didn't you stick it to them? You had a deal?
A. The only way I can tell you is I was part of a team. I was part of --working with this bank to improve the inner city, so maybe I would get a better deal later.
At some point before the fall of 2000, Ashton Ryan became president of the bank. Treme described a meeting he had with Ryan and with First Bank CDC's president, Jamie Neville, shortly after Ryan took over as the bank's president:
I thought it would be the same exact thing as the other guy, look, keep on going, congratulations, y'all are doing a great job. Then basically he seemed like he was really mad and he says we are not doing business like this any more. I said, what are you talking about? He said, you [Treme] are borrowing money [--] and pointing to Jamie Neville [--] on your jobs. That's not going to happen. You still do the work, but we are going to make some profit. It was a very aggressive, hard meeting, but it was more to scream at it see[ms] at Jamie than it was me because he saw Jamie was taking advantage of me or making me or CDC borrow money for their projects. I wasn't an owner of the projects.
Treme said Ryan later told him about a conversation Ryan had with Canizaro about Treme outside of Treme's presence in which Ryan told Canizaro, "We are not doing business like this any more," and Canizaro replied, "Warren is a big boy; he knows what he is signing." According to Treme's account of the conversation, Ryan told Canizaro, "No, he doesn't. You didn't notify him what you actually are doing to him." Treme testified, "That's when we started to change [to] making profit. Then I didn't know this until later obviously because I would have said, okay, guys, it's time to go and do it right now."
At some point before the fall of 2000, Treme became interested in developing a residential subdivision in St. Charles Parish called Riverbend Estates. He asked Canizaro to invest in Riverbend with him and said that Canizaro initially agreed to do that but later changed his mind. Treme testified:
I was extremely disappointed. I worked with Mr. Canizaro ... and the bank and the CDC for years. Busted my tail on *1056 these projects that were going to nowhere, signing notes and I expressed my disappointment to Mr. Ryan about Mr. Canizaro. I thought I was part of this group and all of a sudden, I felt that I wasn't at that point.... I realize[d] then I was never even on a team.
After Canizaro withdrew from the Riverbend deal, Treme partnered with Ryan to develop Riverbend Estates and entered into four more construction contracts on First Bank CDC projects in 2001-2003, with the contract prices totaling more than $1 million.
By 2004, Treme owed the bank $1.1 million on promissory notes he had signed. The bank's records indicate that the loans were secured by collateral valued at $1.2 million, including a second mortgage on Treme's home, a mortgage on his vehicle, assignments of profits and receivables from several First Bank CDC projects, receivables related to the Riverbend project, management fees from the Riverbend project, and estimated profits from future sales of Riverbend lots.
On cross-examination, Treme testified that he did not have an opportunity to inspect the property involved in all of the First Bank CDC projects before he signed the contracts. He said he may have misspoken in his deposition when he said he did have the opportunity to do that. He initially testified that he did not recall whether he had ever taken legal action against anyone for failing to perform on a contract but acknowledged having filed two such lawsuits, in which he verified the accuracy of the allegations, in 2001.
At trial, Treme testified that his relationship with Ryan, who by then was no longer with First Bank, was good and that they successfully developed Riverbend subdivision and another subdivision in St. Tammany Parish.
Treme acknowledged that the Internal Revenue Service had filed tax liens against him for unpaid income taxes for the years 1988, 1989, 1993, 2005, 2006, 2007, 2009 and 2010. The amount of the unpaid assessment for 2005, the year closest in time to Treme's work on First Bank CDC projects, was $125,724. Treme testified that some of the tax liens had been paid off and he was on a payment plan with the IRS for the others. He said he was not denying that he had made money and he will pay the IRS whatever he owes them. Treme did not introduce any tax returns or other records showing which of his business endeavors generated the income that gave rise to his tax liability.
Clark Heebe, who was employed by First Bank CDC from 1998-2002, testified that he was present when Treme expressed his concerns to Jamie Neville, First Bank CDC's president, about the unprofitable construction contracts and was told to "do what you got to do; keep it moving; we're going to find some money." Heebe said, "We believed that to be true at the time," and said they occasionally did find some additional money but that they were under a lot of pressure to complete projects on time because the tax credit funding could be lost if they did not. According to Heebe, Treme "was very excited about moving on to the next project and, hopefully, getting a bigger and better project."
Jonah Dowling was First Bank CDC's project manager from 2002-2005. He testified that his boss, Jamie Neville, negotiated the construction contracts, which Dowling monitored. According to Dowling, Treme was one of four contractors used by First Bank CDC during that time, and they were all treated "more or less the same" from Dowling's standpoint. Dowling said there were no significant cost overruns on the projects he managed, but that *1057 most of those were for new construction, which tends to have fewer cost overruns than renovations of existing structures. Dowling confirmed that it was critical to meet construction deadlines on projects funded with tax credits and said that if Treme had refused to complete a project or to borrow more money to cover cost overruns, they would have had to find an alternative funding source.
Treme called his former loan officer, Brad Calloway, and a senior lender at the bank, Louis Ballero, as witnesses. Both testified that the items of collateral in the bank's records, including the receivables and profits from two First Bank CDC projects, were identified by Treme as sources of repayment for his loans. Calloway said, "The assumption was [that] he would continue to complete those projects."
When asked by Treme's counsel whether the extensions of credit by the bank to Treme were made on the condition or requirement that he continue to provide construction services to the bank's wholly owned subsidiary, First Bank CDC, Calloway testified:
A. No, that was not a requirement. Evidence of that would be we looked at the alternative cash flow sources that Mr. Treme had related to the Riverbend management fee, also the Riverbend ultimate profits that could have come and had he had other contracts with third parties, we certainly would have looked at those as a possible source of cash flow to repay loans.
...
Q. So he, obviously, agreed he would keep working [on First Bank CDC projects]. If he had said, no, I'm not working, take those off the table, you would have had to reconsider the whole what are we going to do?
A. Well, at that point we would have looked for what other new contracts he may have, whether they were with the bank or with a third party, to generate cash flows to determine our source of repayment.
Senior lender Louis Ballero gave similar testimony in response to questioning by Treme's counsel:
Q. [M]y question [is], when you approved this extension of credit, was it done with the condition or requirement, not necessarily put a gun to his head, but the condition or requirement that he continue working on these projects to make them a reliable source of income?
A. I don't know if that was a condition. I mean, some of these projects had been completed but were not profitable. Some needed additional work to create ... a little more value, and I think in this particular loan request and consolidation it was a new project he was getting ready to take underway that probably created a significant higher level of potential profitability and fee income for him that were unrelated to the two bank projects.
Q. ... [I]f my client, Mr. Treme, had said, unh-unh, I'm not going to do it, Brad, I don't care what Louis Ballero says, I'm not giving you this money from the CDC, would this thing get sailed through or would there have been a stop and a decision made, okay, we need to file suit now or we need to take other action?
A. Yeah, I mean if that would have been a call, then probably ... pause there and then refer this to probably the higher level of authority in the bank ....
*1058 Q. But that didn't happen because my client did agree to it and y'all approved the extension, correct?
A. Yes.
Q. Okay.... [I]n other words, the bank approved this loan. One of the conditions was him giving collateral to the bank. We make you a loan, you give us collateral, correct?
A. Yes, sir.
Q. And one of the collateral sources in this case was the CDC projects?
A. Yes, sir.
Q. Okay. So we can say with some confidence that the collateral sources involving the CDC was a condition of this loan being made, correct?
A. I think that was the anticipation. Looking at the Cornerstone project, there was about $67,000 left to be paid and available with $7,000 of costs to be completed by Mr. Treme. And I think the doubles project, which was, again, a bank-owned project, had the potential upon completion of another 70 or $80,000 of profitability.
Q. Okay. And in order for you to go ahead and approve this loan, it was conditioned upon him agreeing that y'all would get as payback the Cornerstone retention and the doubles project?
A. Yes, sir.
Treme's expert witness in banking and banking procedures, Wilmore Whitmore, agreed that on paper, it appeared that Treme had offered the assignments of receivables and profits from his First Bank CDC projects to the bank as security for the loan. However, after hearing Treme's trial testimony, Whitmore stated, "the way he described it, it was not an offer. It was a condition." Considering the size, structure and nature of the loan transactions, Whitmore opined that the bank's loans to Treme were not working capital loans, despite being labeled as such in the bank documents, and that the extensions of credit were tied to Treme providing a security agreement on the bank's own property.
Reginald Smith, the defendants' expert in banking and banking procedures, testified that a contractor will normally borrow 10-20 percent of the contract price at the beginning of a construction contract as working capital to pay for labor and other direct costs before the first payment under the contract is due.
Smith compared the dates, contract prices and loan amounts on a number of Treme's promissory notes and First Bank CDC construction contracts and opined that there was no temporal relationship between the contract work and the loans. For example, Treme signed a $745,000 construction contract in March 1999 but did not borrow any money from First Bank until about a year later. In April 2000, he signed another contract and a promissory note, but the contract price was $47,000 and he borrowed $259,000. In August 2000, he signed a contract for $840,000. The next note was for $44,000 in November.
Smith found no indication of any links between Treme's loans and his First Bank CDC projects other than the fact that the loans appeared to have been made to obtain working capital. He said there was no reference to a particular construction project in the notes.
Smith conducted an extensive review of documents relating to the anti-tying claim in preparation for trial. He testified that he found no evidence of a verifiable cost overrun on a First Bank CDC project. Smith searched the Secretary of State's records, which showed that Treme was involved in other business ventures during the years in question, including the two *1059 subdivision development projects with Ryan.
The expert witnesses expressed differing opinions as to whether Treme's dealings with the bank and First Bank CDC involved unusual banking practices, whether the bank received a benefit from those dealings, and what damages, if any, Treme suffered.
Ryan, Canizaro and Neville were not called as witnesses at trial.
JURY INSTRUCTIONS
As noted above, the trial court instructed the jury on the elements of proof for Treme's anti-tying claim without objection. During an in-chambers conference and on the record in the courtroom, Treme objected to two other portions of the jury instructions, one relating to contract law and the other relating to the fiduciary duty of a bank officer or employee to bank customers:
When the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document. The law does not compel people to read or to inform themselves of the contents of an instrument which they may choose to sign, but it holds them to the consequences, in the same manner and to the same extent as though they had exercised those rights. Under Louisiana law the party who claims that a contract has been modified must establish that parties mutually consented to the agreement as modified.
No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. The fiduciary responsibility and liability of a financial institution or any officer or employee thereof shall be limited solely to performance under such a contract and shall not extend beyond the scope thereof.
Treme sought to have these instructions excluded because the claims being presented to the jury were founded solely on the federal anti-tying law and did not include any claims for breach of contract or breach of fiduciary duty. The trial court overruled Treme's objections.
The trial court found the instructions on contract law to be warranted based on the fact that a number of construction contracts and loan agreements were introduced in evidence and witnesses were questioned about the meaning of some of the contractual language.
With respect to the instructions on breach of fiduciary duty, the court stated:
I do understand your concerns about raising an issue that is not part of your claim at this point. You are making an anti-tying claim. There's been no claim of fiduciary duty.
However, it was raised by your client during the course of these proceedings on a number of occasions; his references to being part of [a] team; of thinking that he was part of a team; specifically references to meetings in which there were representatives from the bank and attorneys and architects around; signing documents that were simply put in front of him without him having a need to read them because he thought they were part of a team and he was part of that team.
Those types of things would imply a fiduciary relationship potentially and I think that the bank has the right to have that charge in there. So your objection is noted to that one.
*1060 JURY VERDICT
The verdict form used by the jury during its deliberations contained five questions. The first four questions asked whether the jury found, by a preponderance of the evidence:
(i) that a tying arrangement(s) existed between Treme and First Bank;
(ii) that the tying arrangement(s) constituted an unusual banking practice;
(iii) that one or both defendants benefited from the tying arrangement(s); and
(iv) that Treme suffered damages as a result of the tying arrangement(s).
The fifth question asked what amount of damages would reasonably and fairly compensate Treme for the damages suffered as a result of the tying arrangement(s).
As previously noted, the jury answered the first question in the negative and did not answer the other questions.
The trial court adopted the jury's verdict as the court's judgment and dismissed Treme's demands against First Bank and First Bank CDC with prejudice, including any claims of set-off reserved to him in the earlier consent judgment in the bank's favor.
ASSIGNMENTS OF ERROR
Treme seeks reversal of the judgment of dismissal based on two assignments of error:
(1) The trial court committed reversible error in instructing the jury on the law on contract interpretation and the law on the fiduciary duty of a bank officer or employee to its customers when the only issue before the jury was First Bank's alleged violation of the Bank Anti-Tying Act;
(2) Based on the evidence presented, the jury was clearly wrong in finding that no tying arrangement existed between First Bank and Treme.
Treme asks this court to either grant a new trial or, alternatively, to review the evidence de novo and render a judgment in his favor for all damages proven.
With respect to the first assignment of error, First Bank contends Treme did not adequately preserve his objections to the jury charges. Alternatively, the bank claims the instructions were appropriate in light of the evidence presented at trial. As to the second assignment of error, the bank contends the evidence clearly supports the jury's verdict.
LAW AND ANALYSIS
Jury Instructions
We find no merit to First Bank's contention that Treme did not adequately preserve his objections to the jury charges because his objections were not stated with the degree of specificity required by La. C.C.P. art. 1793.[3] The record indicates that the parties initially informed the trial judge of their objections to the proposed jury charges in chambers and later reasserted them on the record. It is clear from the trial court's reasons for overruling the objections that the court understood the specific basis for Treme's objections.
Trial courts are given broad discretion in formulating jury instructions. A trial court judgment should not be reversed so long as the jury charge correctly states the substance of the law. In considering an allegedly erroneous jury instruction, the reviewing court must assess the *1061 alleged impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberations. Adams v. Rhodia, Inc., 07-2110 (La. 5/21/08), 983 So.2d 798, 804-805 ; Willis v. Noble Drilling (US), Inc., 11-598 (La. App. 5 Cir. 11/13/12), 105 So.3d 828, 839.
On appellate review of a jury trial, the mere discovery of an error in the judge's instructions does not, in and of itself, justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Id.
In this case, the jury instructions, taken as a whole, correctly stated the substance of the law and adequately informed the jury of the specific elements of proof required of Treme under the anti-tying law in order for him to prevail on his damage claims. The wording of the questions in the verdict form made it clear to the jury that each element of proof in the case was related to the anti-tying law. The trial court's reasons for overruling the objections before instructing the jury are supported by the record. Additionally, after deliberations began, the jury asked to see the judge's instructions and the binder of contracts. With the contracts being a key part of the evidence in the case, it was appropriate for the trial court to instruct the jury on a few basic points of contract law.
Under the circumstances presented, the trial court did not abuse its discretion in overruling Treme's objections to the two jury instructions. Assuming, without finding, that there was any error in either of those instructions, we cannot say that it would have misled the jury to the extent of preventing the jury from dispensing justice in the case. Accordingly, it would not constitute reversible error. Adams v. Rhodia, Inc., supra ; Willis v. Noble Drilling (US), Inc., supra.
Jury Verdict - Standard of Review
In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error - clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n , 02-2660 (La. 6/27/03), 851 So.2d 1006, 1023 ; Rosell v. ESCO , 549 So.2d 840, 844 (La. 1989) ; Canter v. Koehring Co. , 283 So.2d 716, 724 (La. 1973).
The trier of fact is in a better position to evaluate the credibility of witnesses and make factual determinations than is a reviewing court. Parish Nat. Bank v. Ott , 02-1562 (La. 2/25/03), 841 So.2d 749, 753. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Hall v. Folger Coffee Co., 03-1734 (La. 4/14/04), 874 So.2d 90, 98. Rather, before reversing a trial court's factual findings, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La. 1993).
This test requires the reviewing court to do more than simply review the record for some evidence that supports or controverts the trial court's findings. The court must review the entire record to *1062 determine whether the trial court's findings were clearly wrong or manifestly erroneous. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's fact-finding conclusion was a reasonable one. Id.
Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Varmall v. Bankers Specialty Ins. Co. , 15-223 (La. App. 5 Cir. 10/28/15), 178 So.3d 181, 183-84citing Waguespack v. Sentry Select Ins. Co. , 12-280 (La. App. 5 Cir. 11/13/12), 105 So.3d 880, 884-85, writ denied , 12-2700 (La. 2/8/13), 108 So.3d 90. Moreover, where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Id. , 178 So.3d at 184. It is only where the objective evidence so contradicts a witness' testimony, or the testimony itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it, that the court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. Id.
When an appellate court finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to re-determine the facts de novo from the entire record and render a judgment on the merits. Ferrell v. Fireman's Fund Ins. Co. , 94-1252 (La. 2/20/95), 650 So.2d 742, 745. While great deference should be accorded to the fact finder, appellate courts have a constitutional duty to review facts. To perform this constitutional duty properly, the appellate court must determine whether the lower court's conclusions were clearly wrong based on the evidence or are clearly without evidentiary support. Stewart v. State through Dept. of Transp. & Dev. , 08-0772 (La. App. 1 Cir. 3/20/09), 9 So.3d 957, 963, writ denied , 09-1228 (La. 9/18/09), 17 So.3d 968.
Jury Verdict - Analysis
Treme contends the jury was clearly wrong in finding the evidence insufficient to prove that a tying arrangement existed between First Bank and Treme. He claims the undisputed facts presented at trial indicate that the bank required him to continue creating revenue to secure the bank loans by performing construction work on the bank's construction projects.
The bank asserts that there was ample evidence to support the jury verdict. The bank contends there were numerous inconsistencies and deficiencies in Treme's case which called his credibility into question, and claims Treme did not present evidence to corroborate his allegations.
Considering the totality of the evidence presented at trial, we cannot say the jury was clearly wrong in finding insufficient proof that a tying arrangement existed between First Bank and Treme.
The jury heard conflicting evidence as to whether the loans to Treme were conditioned on a requirement that he continue working on First Bank CDC projects, from which he claimed he never made any money. Treme did not present any evidence to substantiate his contentions that he lost money on every First Bank CDC project due to cost overruns and that all of the money he borrowed from the bank was used to pay for those overruns. The jury heard evidence that Treme was involved in other business ventures at the time, including the development of Riverbend Estates subdivision, a major real estate development. Treme made enough money in 2005 to be assessed with more than *1063 $125,000 in federal income tax liability. He did not provide any documentary evidence to show which of his businesses were profitable and which were not. Treme testified that all of his business records were lost in Hurricane Katrina. However, his 2005 tax return was not due until the year after Katrina.
Treme testified that he initially continued to do business with First Bank CDC despite making no money because he considered himself to be part of the bank's community development team and he hoped to be part of bigger and better projects in the future. Even after realizing that he was not part of that team, however, Treme continued to sign contracts to work on First Bank CDC projects.
Although profits and receivables from a few First Bank CDC projects were included as collateral for loans to Treme in 2003 and 2004, they made up only a small portion of the total value of the collateral ($147,000 of $1.2 million). Most of the collateral came from sources unrelated to First Bank CDC projects.
Treme and his expert witness testified that the bank loans were conditioned on a requirement by the bank that Treme continue working on First Bank CDC projects. The bank's loan officers, Calloway and Ballero, both of whom were called as witnesses by Treme, said Treme's contracts on First Bank CDC projects were included as collateral for the loans because Treme identified them as repayment sources, along with other collateral. Calloway testified that the bank did not require Treme to continue working on First Bank CDC projects as a condition of the loans and said the bank would have considered other contracts, including contracts with third parties not affiliated with the bank, as possible repayment sources if Treme had stopped working on First Bank CDC projects. The defense expert found no evidence of a link between the loans and the contracts on First Bank CDC projects in his review of the bank's records and other documents.
The evidence in this case indicates that Treme, as a self-employed borrower, identified ongoing or completed First Bank CDC projects as one source of income available to him for repaying the money he borrowed from the bank and pledged the income he anticipated receiving from those contracts, along with a number of other assets unrelated to First Bank CDC projects, to secure repayment of the loans. Under such circumstances, the fact that the bank assumed or anticipated that he would continue working on those projects does not amount to proof that the bank tied the extensions of credit to a requirement that Treme furnish some additional service to the bank or its subsidiary other than repayment of the loan.
Treme's reliance on Dibidale of Louisiana, Inc. v. American Bank & Trust Company, New Orleans, 916 F.2d 300 (5th Cir. 1990) as support for his position is misplaced. In that case, the appellate court found that there were genuine issues of material fact as to whether a tying arrangement existed and reversed the district court's grant of summary judgment. In this case, the anti-tying claim is before us after a trial on the merits in which the jury was presented with two permissible views of the evidence and resolved the conflicts by concluding that Treme did not prove the existence of a tying arrangement by a preponderance of the evidence. On this record, we cannot say the jury was clearly wrong.
DECREE
The trial court judgment dismissing Treme's demands against First Bank and *1064 First Bank CDC with prejudice on the basis of the jury verdict is affirmed.
AFFIRMED

State courts have concurrent jurisdiction with federal courts over claims arising under the anti-tying provisions of the Bank Holding Company Act. Cuervo Resources, Inc. v. Claydesta National Bank, 876 F.2d 436 (5th Cir. 1989) ; Lane v. Central Bank of Alabama, N.A., 756 F.2d 814 (11th Cir. 1985).

For simplicity at trial and on appeal, Treme is referred to as the plaintiff; First Bank and First Bank CDC are referred to as the defendants.

La. C.C.P. art. 1793(C) states in part: "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection."